543 So.2d 924 (1989)
BORDEN, INC.
v.
GULF STATES UTILITIES COMPANY.
No. 88 CA 0320.
Court of Appeal of Louisiana, First Circuit.
April 11, 1989.
Writ Denied June 2, 1989.
*925 B. Richard Moore, Jr., Carolyn Parmenter, New Orleans, R. Gordon Kean, Baton Rouge, for Borden, Inc., Monochem, Inc. and Uniroyal Chemical Company, Inc.
William Shaddock, Lake Charles, for Gulf States Utilities Co.
Before CARTER, LANIER and LeBLANC, JJ.
CARTER, Judge.
This is a suit arising out of a contract for electric service.

FACTS
Borden, Inc. (Borden) and Uniroyal Chemical Company, Inc. (Uniroyal) own and operate separate chemical manufacturing facilities on adjacent tracts of land in Geismar, Louisiana. Monochem, Inc. (Monochem), a nonprofit service corporation jointly owned by Borden and Uniroyal, supplies services and utilities, including electricity, to Borden and Uniroyal for use in their chemical manufacturing processes. Monochem purchases electricity from Gulf States Utilities Company (GSU) for its own use and that of Borden and Uniroyal.[1]
Prior to 1981, GSU provided Monochem electricity pursuant to a 1961 agreement. The 1961 agreement contained a fifteen-year term and an "evergreen provision," which provided that after the fifteen-year term of the contract, either party to the contract could cancel by giving a two-year notice. Sometime during 1978, GSU exercised its option to cancel the contract. The parties then began negotiating a new contract for electric service, which resulted in the 1981 agreement.
The 1981 agreement consists of a printed form contract used by GSU, several riders, and a transmittal letter, dated May 27, 1981. The form contract permitted the customer to select the type of electric service needed, namely standard service or auxiliary or standby service.[2] Standard service or firm power service is electric service which GSU is obligated to provide and which the customer requires on a regular and continuous basis. Standby or auxiliary service is electric service that is provided on an "as needed" basis. The form contract was for standard service only.
The form contract also contained the following pertinent provisions:
[C]ustomer's obligation to pay facilities charges is unconditional, and such charges are payable regardless of such Customer's inability or failure to take service for any reason, and minimum charges under applicable schedules are due and payable in all events (except as provided above with respect to strike, damage or destruction) even though such Customer takes no service or takes less than the amount on which the minimum charge is based.
Customer is aware that auxiliary and standby service from Company must be specifically contracted. Unless such service is designated at the top of this contract, Company's obligation to supply electric service shall be conditioned on such service being Customer's exclusive source of electric power for the term of this contract.
The contract was dated April 13, 1981,[3] but was not signed by GSU or Monochem until November 11, 1981.
Rider A recognized the corporate and physical interrelationships among Borden, Uniroyal, and Monochem and classified these corporations as a single customer for the purposes of supplying electricity under *926 the 1981 agreement.[4] Rider B set forth the estimated monthly facilities charge.[5] The facilities charge was designed to reimburse GSU for the equipment installed to deliver power to the Monochem substation. Rider C permitted Monochem to reduce by 15% the amount of kilowatt demand or contract power on three specified dates.[6] Under the terms of the 1981 agreement, the amount of contract power was 85,000 kilowatt hours.
Also made part of the 1981 agreement was a transmittal letter, dated May 27, 1981, to Borden from Michael A. Ketterer, Industrial Services Engineer of GSU. The letter provided, in part, as follows:
Attached please find two (2) copies of the proposed Agreement for Electric Service between Gulf States Utilities and Monochem, Inc.
Please have a contracting official with Monochem sign both copies. Keep one copy for your files, and return the other to my attention.
The purpose of the contract language in Article V, last paragraph concerning auxiliary or standby service, is not to restrict the customer from installing and operating alternate energy sources. The stipulation outlined in this paragraph simply requires the customer to notify GSU if any auxiliary or standby service is used within the plant and operated in parallel with our system, and specifically contract for this service in a rider to the Electric Service Agreement.
If the customer does not choose to contract for auxiliary or standby service in the original agreement, this contract can be amended at the customer's request during the term of the contract to include this type of service.
In 1984, Borden began to gradually install cogeneration facilities. When all of its cogeneration facilities were operational, Borden determined that it no longer required the standard electric service, which was the object of the 1981 agreement between GSU and Monochem. Borden then requested that GSU amend the 1981 agreement to reduce and/or eliminate the minimum charges for firm power. GSU refused.
On December 4, 1986, Borden filed suit for declaratory judgment, specific performance, and injunctive relief, alleging that GSU's failure and refusal to amend the 1981 agreement to permit cogeneration, to supply plaintiff with adequate standby power, to eliminate the minimum demand charges allegedly due under the 1981 agreement, and to purchase excess electric energy cogenerated by Borden constituted a breach of contract. Pursuant to exceptions filed by GSU, Monochem and Uniroyal joined Borden as parties-plaintiffs.
After trial, the trial court determined that Borden, Monochem, and Uniroyal were one customer of GSU under the 1981 agreement for electric service. The trial court further determined that, because Borden had received certificates from the Federal Energy Regulatory Commission qualifying its three cogeneration facilities, GSU was obligated to provide standby power to each of Borden's existing cogeneration facilities at rates approved by the Louisiana Public Service Commission and to purchase excess electricity generated by Borden's cogeneration units under terms and conditions established by the Commission. Judgment was otherwise rendered in favor of GSU rejecting Borden's demand for a declaratory judgment, specific performance, and a permanent injunction and dismissing Borden's suit. The trial court also recognized Borden's contractual obligation to pay the minimum demand charges to GSU. Monochem, Borden, and Uniroyal appealed that portion of the judgment, assigning the following specifications of error:

*927 1. The trial court erred in determining that the contract was clear and unambiguous after receiving substantial evidence of the parties' intent and the facts and circumstances surrounding contract negotiation.
2. The trial court erred in its application of the rules of contract construction, in that the trial court failed to interpret the contract in accordance with the intent of the parties, failed to interpret doubtful contractual provisions against GSU, and failed to interpret the contract in accordance with principles of equity.
GSU neither appealed nor answered the appeal, and consequently that portion of the judgment rendered against GSU is now definitive and not at issue.

CONTRACT INTERPRETATION
Borden, Monochem, and Uniroyal contend that the trial court erred in finding that the 1981 agreement was clear and unambiguous. Borden, Monochem, and Uniroyal reason that, because the trial court held a full evidentiary hearing and accepted evidence surrounding the negotiations of the 1981 agreement, the contract was ambiguous.
The contract between parties is the law between them, and the courts are obligated to give legal effect to such contracts according to the true intent of the parties. Bailey v. Franks Petroleum, Inc., 479 So. 2d 563 (La.App. 1st Cir.1985); G/O Enterprises, Inc. v. Mid Louisiana Gas Company, 444 So.2d 1279 (La.App. 4th Cir.1984), writ denied, 446 So.2d 318 (La.1984); Rebstock v. Birthright Oil & Gas Co., 406 So.2d 636 (La.App. 1st Cir.1981), writ denied, 407 So.2d 742 (La.1981). This intent is to be determined by the words of the contract when they are clear, explicit, and lead to no absurd consequences. LSA-C.C. art. 2046; Thomas v. Knight, 457 So.2d 1207 (La.App. 1st Cir.1984); Campesi v. Margaret Plantation, 417 So.2d 1265 (La. App. 1st Cir.1982), writ denied, 422 So.2d 163 (La.1982).
When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. LSA-C.C. art. 2046; Investors Associates Ltd. v. B.F. Trappey's Sons, Inc., 500 So. 2d 909 (La.App. 3rd Cir.1987), writ denied, 502 So.2d 116 (La.1987); Kalmn, Inc. v. Walker Louisiana Properties, 488 So.2d 340 (La.App. 3rd Cir.1986). Further, the rules of interpretation establish that when a clause in a contract is clear and unambiguous, the letter of that clause should not be disregarded under the pretext of pursuing its spirit. LSA-C.C. art. 2046, comment (b); Cashio v. Shoriak, 481 So.2d 1013 (La.1986).
The meaning and intent of the parties to the written contract in such cases must be sought within the four corners of the instrument and cannot be explained or contradicted by parol evidence. LSA-C.C. art. 1848; Tauzin v. Claitor, 417 So.2d 1304 (La.App. 1st Cir.1982), writs denied, 422 So.2d 423 (La.1982). Contracts, subject to interpretation from the instrument's four corners without the necessity of extrinsic evidence, are to be interpreted as a matter of law, and the use of extrinsic evidence is proper only where a contract is ambiguous after an examination of the four corners of the agreement. Investors Associates Ltd. v. B.F. Trappey's Sons, Inc., supra. See Kemp v. Hudnall, 423 So.2d 1260 (La.App. 1st Cir.1982), writs denied, 428 So.2d 474 (La.1983) and Wilson v. Cost + Plus of Vivian, Inc., 375 So.2d 683 (La.App. 2nd Cir.1979).
When the terms of a written contract are susceptible to more than one interpretation, or there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed, or fraud is alleged, parol evidence is admissible to clarify the ambiguity, show the intention of the parties, or prove fraud. Dixie Campers, Inc. v. Vesely Company, 398 So.2d 1087 (La.1981); Ayers v. Kent, 438 So.2d 691 (La.App. 2nd Cir.1983). In cases in which the contract is ambiguous, the agreement shall be construed according to the intent of the parties. LSA-C.C. art. 2045. Intent is an issue of fact which is to be inferred from all of the surrounding circumstances. *928 Kuswa & Associates, Inc. v. Thibaut Construction Co., Inc., 463 So.2d 1264 (La. 1985); Commercial Bank & Trust Company v. Bank of Louisiana, 487 So.2d 655 (La.App. 5th Cir.1986). Any doubtful provisions must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and other contracts of a like nature between the same parties. LSA-C.C. art. 2053; Allen v. Burnett, 530 So.2d 1294 (La.App. 2nd Cir.1988).
Whether a contract is ambiguous or not is a question of law. Myers v. Myers, 532 So.2d 490 (La.App. 1st Cir.1988); Aycock v. Allied Enterprises, Inc., 517 So.2d 303 (La. App. 1st Cir.1987), writs denied, 518 So.2d 512, 513 (La.1988). Where factual findings are pertinent to the interpretation of a contract, those factual findings are not to be disturbed unless manifest error is shown. See G/O Enterprises, Inc. v. Mid Louisiana Gas Company, supra and Universal Iron Works, Inc. v. Falgout Refrigeration, Inc., 419 So.2d 1272 (La.App. 1st Cir.1982). However, when appellate review is not premised upon any factual findings made at the trial level, but is, instead, based upon an independent review and examination of the contract on its face, the manifest error rule does not apply. Conoco, Inc. v. Tenneco, Inc., Tennessee Gas Pipeline Company, 524 So.2d 1305 (La.App. 3rd Cir. 1988), writ denied, 525 So.2d 1048 (La. 1988). In such cases, appellate review of questions of law is simply whether the trial court was legally correct or legally incorrect.
The controversy in this case centers on the provisions of the 1981 agreement concerning the minimum demand charges for standard service. The language in the 1981 agreement relative to the minimum demand charges is located in the second paragraph of Article V of the form contract, which is entitled Terms and Conditions, and provides, in pertinent part, as follows:
However, such Customer's obligation to pay facilities charges is unconditional, and such charges are payable regardless of such Customer's inability or failure to take service for any reason, and minimum charges under applicable schedules are due and payable in all events (except as provided above with respect to strike, damage or destruction) even though such Customer takes no service or takes less than the amount on which the minimum charge is based. (Emphasis added)
The last paragraph of Article V of the form contract also contains provisions relative to standby or auxiliary service and the exclusive source requirement and provides, in pertinent part, as follows:
Customer is aware that auxiliary and standby service from Company must be specifically contracted. Unless such service is designated at the top of this contract, Company's obligation to supply electric service shall be conditioned on such service being Customer's exclusive source of electric power for the term of this contract.
Borden, Monochem, and Uniroyal contend that the Ketterer letter, dated May 27, 1981, which was part of the 1981 agreement, represents an amendment to the minimum demand charges or, at least, creates an ambiguity as to whether GSU agreed to substitute standby service for firm power with minimum demand charges.
The pertinent portion of the Ketterer letter provides as follows:
The purpose of the contract language in Article V, last paragraph concerning auxiliary or standby service, is not to restrict the customer from installing and operating alternate energy sources. The stipulation outlined in this paragraph simply requires the customer to notify GSU if any auxiliary or standby service is used within the plant and operated in parallel with our system, and specifically contract for this service in a rider to the Electric Service Agreement.
If the customer does not choose to contract for auxiliary or standby service in the original agreement, this contract can be amended at the customer's request during the term of the contract to include this type of service.
*929 After carefully reviewing the entire agreement, we find that the trial court correctly determined that there was no ambiguity in the words of the disputed portion of the 1981 agreement. The pertinent part of Article V, as quoted earlier, clearly states that the minimum charges under applicable schedules are due and payable even though the customer takes no service or takes less than the amount on which the minimum charges are based. The section of the Ketterer letter that Borden, Monochem, and Uniroyal contend operates as a waiver of the minimum demand charges merely explains the purpose of the language in the last paragraph of Article V of the contract and allows cogeneration. The two contested paragraphs of the Ketterer letter require that the customer notify GSU of any auxiliary or standby services used within the plant and operated in parallel with GSU's system and specifically contract for standby service in a rider to the 1981 agreement. It further allows for amendment to the original contract to provide for standby service or auxiliary service during the term of the contract.
In the Ketterer letter, GSU agreed that the customer could cogenerate electricity despite the provisions to the contrary in Article V of the form contract, and the customer could either add standby power to the contract at the time of execution of the contract or later by contract amendment. No portion of this letter contains a promise or an implication that GSU agreed to substitute standby service for firm service or to reduce or eliminate the minimum demand charges for electric service contained in the 1981 agreement, subject to periodic reduction contained in Rider C.
Therefore, we find that the trial court correctly determined that the provisions of the 1981 agreement clearly and unambiguously provided for minimum demand charges.
Even assuming arguendo that the 1981 agreement was ambiguous and that we must look to extrinsic evidence, we find that the trial court was correct in its conclusions. There is extensive evidence in the record concerning what the parties intended and understood with regard to the minimum demand charges.
Borden's internal memorandum, introduced as evidence at trial, clearly supports a literal interpretation of the contract that the minimum charges were due regardless of electric use. Exhibit D-62(B), is a memo entitled "Risks of the Project" and provides:

Contract: The present contract with GSU does not expire until October, 1991. This contract requires Monochem to pay demand charges equal to a minimum of 60% of the highest demand set during the life of the contract whether we import the power or not. Negotiations are presently underway with GSU to eliminate this demand penalty. This represents as much as $25,000,000 over 5 years for Cogen 2 and Cogen 3. The economics represented here have taken this penalty into account. (Emphasis added).
A second memo, introduced as Exhibit D-28, reads in pertinent part:

Contract: The present contract with GSU requires us to pay a minimum demand charge whether or not we take the power. If we are not able to negotiate out of this charge, then the return will be lower by over $5,000,000 per year. This charge is reflected in the Worst Case economics shown below.
These documents clearly show that Borden, Monochem, and Uniroyal were aware of their obligation to pay the minimum demand charges.
It is clear that the intent of Borden, Monochem, and Uniroyal was to negotiate out the minimum demand charges and that they entered into the 1981 agreement for electric service with full knowledge that they were unsuccessful in their negotiations. Therefore, they entered into the agreement with full appreciation of the consequences of their unsuccessful negotiations. Borden, Monochem, and Uniroyal then sought assistance from the courts to obtain what they could not obtain through negotiation and did not obtain by contract.
Therefore, we conclude that the trial judge correctly determined that Borden, *930 Monochem, and Uniroyal were obligated, under the clear terms of the 1981 agreement, to pay GSU the minimum demand charges.

CONCLUSION
For the above reasons, the judgment of the trial court recognizing Borden's contractual obligation to pay the minimum demand charges to GSU is affirmed.[7] Borden, Monochem, and Uniroyal are cast for all costs.
AFFIRMED.
NOTES
[1] Electricity from GSU is sent to the Monochem substation. Monochem receives the power, uses a small portion for itself, and redistributes power to Borden and Uniroyal. Of the total power received by the Monochem substation, Monochem uses 2%, Borden uses 74%, and Uniroyal uses 24%.
[2] The form contract contained the following language with regard to selection of the type of electric service:
 Standard Service X 
Auxiliary or Standby Service _______

[3] By letter dated November 20, 1981, the effective date of the 1981 agreement was changed from March 1, 1981, to October 19, 1981. This change was approved by Monochem on December 14, 1981.
[4] Rider A was dated April 13, 1981, but was not signed by GSU or Monochem until September 16, 1981, and November 11, 1981, respectively.
[5] Rider B, dated August 25, 1981, was signed by GSU on August 26, 1981, and by Monochem on November 11, 1981.
[6] Rider C permitted reduction of contract power on January 1, 1985, January 1, 1987, and January 1, 1989.
[7] The only portion of the trial court judgment which was appealed is the recognition of the contractual obligation for the minimum demand charges. The other portions of the trial court judgment which were not appealed are now final.