617 So.2d 1259 (1993)
EVANGELINE PARISH SCHOOL BOARD, Plaintiff-Appellee,
v.
ENERGY CONTRACTING SERVICES, INC., Defendant-Appellant.
No. 92-969.
Court of Appeal of Louisiana, Third Circuit.
May 5, 1993.
*1260 Allen Bruce Rozas, Mamou, for Evangeline Parish School Bd.
Joseph B. Dupont, Sr., Plaquemine, Anthony Craig Dupre, Ville Platte, for Energy Contracting Services, Inc.
Before LABORDE, THIBODEAUX and SAUNDERS, JJ.
SAUNDERS, Judge.
In this contract dispute, defendant, Energy Contracting Services, Inc., appeals from the trial court's award of $127,432.00 to plaintiff, Evangeline Parish School Board, and the trial court's finding that the contract between plaintiff and defendant was invalid. We amend and remand.

FACTS
Plaintiff, Evangeline Parish School Board (Board), entered into a contract with defendant, Energy Contracting Services, Inc. (ECS), on November 12, 1985. After inspection and approval with slight modifications by the Board and its attorney, the contract was validly executed by the Superintendent at that time, Sidney Ortego, under the authority of a Board passed resolution. The contract, entitled "Governmental Shared Savings Program, Management Service Agreement," provided for consultation services with respect to the conservation of energy and the reduction of the Board's expenditures for energy consumption and energy expenses. The term consisted of an installation period not to exceed six (6) months, and a billing period of thirty-six (36) months.
The contract provided that ECS would inspect the schools within the Board's school district and determine energy saving techniques. If required, ECS would furnish and install equipment relative to the conservation of energy or simply modify the existing equipment.
In order to determine energy use and savings, the contract set forth the basis for its calculation as follows:
X.
BASIS FOR CALCULATION OF ENERGY SAVINGS. The energy use and/or consumption of the properties described on Exhibit "A" hereof, shall be determined and calculated on a monthly basis for the previous twelve (12) month period immediately prior to the effective date of this Agreement, and as a monthly average for the past two (2) years, utilizing acceptable standards for energy use determination. The higher of the two (2) total energy use figures shall be known as the "Base Monthly Energy Use Figure". These base energy use figures are set forth in an addendum to this Agreement marked Exhibit "B".
Energy use savings shall be calculated on a monthly basis by comparing the current energy use statement with the base monthly energy use figure applicable for the time period reported. In all cases, for the lifetime of this Agreement, actual savings realized mean the difference in fuel cost and KWH consumption and demand as recorded by the public utility serving the owner for any current period under this Agreement compared with the like period in the base year multiplied by the rates applicable to the current period.
*1261 Attached to and made part of the contract, as Exhibit "B", were the base monthly use figures for each school. The exhibit was signed by Max Hamlin, the Assistant Superintendent, on January 30, 1986.
For two and one-half (2½) years ECS billed the Board and the Board paid without objection. Then, in August of 1987, the Board, under the authority of its new Superintendent, Larry Broussard, refused to continue to honor the contract. Broussard testified at trial, to-wit:
ON DIRECT EXAMINATION BY PLAINTIFF'S ATTORNEY
Q. You were superintendant when ya'll quit paying. We already have that in the record, that August the 14th ...
A. That is correct.
Q. Why did the school board stop paying?
A. Well, as II think over a period of three or four months, whatever, as I got these bills, and I saw what it was costing the board, then I became concerned about that and at that point in time I talked to our accountant to see what we had been paying and then determined that the best thing to do was take a serious look at that before we continued paying.
Q. Okay. And you came to a decision that to simply quit paying.
A. That is correct.
Q. And eventual litigation. That's where we are today.
ON CROSS-EXAMINATION BY DEFENDANT'S ATTORNEY
Q. You became superintendant in July of '86. Is that correct, sir?
A. That's correct.
Q. For approximately 13 months while you were superintendant you did pay the contract.
A. I would say yes.
Q. Okay. And I believe you testified that you quit paying the contract after you had discussed something with the accountant. Is that correct, sir?
A. No, I think what I did is I discussedI guess. That's probably correct, because I think what happened is as I kept getting these bills I became increasingly concerned about em, so I'm sure I discussed it with Albert at that point in time.
Q. Yes, sir. And you just thought the bills weren't fair.
A. That is true.
Q. Okay. Why did you think the bills weren't fair?
A. Well, basically, my understanding of the original agreement was that it was to save us money, and I couldn't determine how paying these fees to your company was saving us money, quite frankly.
Q. Okay.
ECS sent notices to the Board regarding its failure to comply with the terms of the contract. On February 9, 1988, the Board filed suit to cancel the contract alleging the following:
That defendants violated the contract in the following nonexclusive particulars:
A. In billing for alleged services prior to the effective date of the contract.
B. In failing to furnish a detailed list of proposed and installed modifications.
C. In failing to furnish the calculations for the base figures and in miscalculating same.
D. In calculating usages on a "per meter basis" versus a "total system basis".
E. In miscalculating the total energy use figures.
F. In using inconsistent billing days.
G. In switching between base month calculation methods.
H. In committing numerous math and energy consumption calculation inaccuracies.
I. In failing to credit for higher energy use.
J. In failing to install or failing to maintain or using inadequate or ineffective energy savings equipment *1262 all in violation of accepted industry standards, the provisions of the contract, and applicable Louisiana law.
ECS reconvened, praying for the past due amounts of $100,942.87 and for specific performance for the duration of the term. ECS further prayed for penalties, interest, and attorney's fees.
Trial was held on April 27 and 28, 1992. The trial judge granted judgment in favor of the Board and against ECS in the amount of $127,432.00, plus interest and costs. Our calculations indicate that the trial court refunded all of the monies the Board paid to ECS. The trial judge dismissed the reconventional demand against the Board.
The trial judge issued reasons for judgment, reproduced in part, as follows:
The Court finds Paragraph V of the contract between plaintiff and defendant to also be of significant importance. Paragraph V of the contract provides as follows:
"DESCRIPTION OF WORK. Upon completion of inspection and analysis provided for in Paragraph 1 above, consultant shall furnish owner with a detailed descriptive list of proposed modifications and changes to owner's existing equipment and a detailed descriptive list of equipment and services to be furnished and installed by consultant along with other recommendations to owner relative to the conservation of energy and owner's existing equipment. The installation of new equipment shall not interfere with owner's use of facilities situated on the property described in Exhibit A hereof. Prior to commencement of any work under this Agreement by consultant, owner shall approve, in writing, the detailed descriptive list provided for hereinabove. The said detailed descriptive list may be amended and supplemented by the mutual agreement of the parties hereto. If both parties are unable to agree on the actions enumerated in the initial detailed descriptive list, the building (s) in question shall be deleted from this contract. The modifications and changes referred to in this Paragraph shall be performed by consultant at no cost to the owner. Owner agrees not to unreasonably withhold approval for installation of equipment necessary for the effective operation of the system."
No evidence has been adduced which would indicate that Energy Contracting Service complied with this provision of the contract. There is no evidence of an inspection and an analysis nor a detailed descriptive list of proposed modifications and changes to the Evangeline Parish School Board's existing equipment nor a detailed descriptive list of any equipment and services to be furnished and installed by Energy Contracting Services to have been prepared by Energy Contracting Services much less having been furnished in writing to Evangeline Parish School Board prior to the inception of any work by Energy Contracting Services. The above quoted paragraph in addition also provides that prior to commencement of any work by Energy Contracting Service the owner shall approve in writing the detailed descriptive list provided by Energy Contracting Service. Since none was provided there could be no approval in writing.
R.C.C. Art. 1966 states "No obligation can exist without a lawful cause" R.C.C. Art. 1967 states in part "cause is the reason why a party obligates himself." R.C.C. 1756 et seq defines obligations and states they arise from contracts, etc. R.C.C. Art. 1767 defines suspensive conditions (with which we are here concerned) and states "a conditional obligation is one dependent on an uncertain event." Parapharasing the balance of the article, the obligation cannot be executed until after the event occurs. The Court is of the opinion that a suspensive condition existed in the instant case and the failure of Energy Contracting Services to fulfill the requirements of Paragraph V of the contract (a suspensive condition) was a pre-requisite to the existence of a binding contract. This is so despite the ill advised actions of the superintendent and the staff responsible, *1263 who evidently, failed to read, much less understand the contract provisions between it and Energy Contracting Services, Inc. While actions of the superintendent (and whoever on his staff was undoubtedly responsible) of the Evangeline Parish School Board failed to require Energy Contracting Services to perform in accordance with this paragraph before sending Energy Contracting Services utility usage information upon which to bill the Evangeline Parish School Board in accordance with Paragraph V of the contract this was not a substitute for performance of the suspensive condition nor did it estop Evangeline Parish School Board from urging the failure of performance of Paragraph V as a suspensive condition.
Assuming arguendo the suspensive condition to be fulfilled and the existence of a valid contract the Court finds as a fact that the monthly basis calculated under Paragraph X of the contract by Energy Contracting Services was incorrect and improper. Energy Contracting Services was to use one of the two methods provided by Paragraph X. Instead they interchanged them, combined and mismatched electric demand and usage figures and on gas usage figures sometimes used pre 1985 gas figures because one individual meter had been disconnected. Energy Contracting Services also failed to compare basis figures with current billings on a campus by campus basis. They combined figures incorrectly and made incorrect calculations. In fact Energy Contracting Services billed savings before ever performing any type of energy saving work provided by Paragraph V of the contract. In arriving at the monthly basis Energy Contracting Services also took the low figures and zeroed the highs. They also failed to take into account the installation of new and more efficient equipment as and when installed as they were not monitoring anything.

ASSIGNMENTS OF ERROR
Defendant, ECS, appeals, asserting the following assignments of error:
1. The Court erred in finding that the contract between Energy Contracting Services, Inc., (ECS) and the Evangeline Parish School Board (school board) had not gone into effect because of an alleged suspensive condition, even though it had been relied on and acted on by both parties for 2½ years.
2. The Court erred in re-writing and re-calculating the formula agreed on by the parties to the contract and finding that no savings had occurred.

LAW AND PRINCIPLES
The law of contracts in Louisiana is very specific: Agreements legally entered into have the effect of laws on those who have formed them. In following this language, we have declared that parties are free to make their own contracts, and however unusual, drastic, or unreasonable features may be therein, they should be enforced so long as they do not contravene good morals or public policy. See LSA-C.C. arts. 1759, 1983; Arkansas Fuel Oil Corporation v. Maggio, 141 So.2d 516 (La.App. 4th Cir. 1962); Roser v. Webb, 542 So.2d 122 (La. App. 1st Cir.1989).
The policy of the law is that all men of lawful age and competent understanding shall have the utmost liberty of contracting and their contracts, when freely and voluntarily made, are not lightly to be interfered with by the courts. The court is not concerned with the wisdom or folly of the contract. The contract in this respect may be a hard one for the plaintiff, but it is one that the parties were competent to make and had the right to make. It is the law between the parties and the courts have no alternative except to enforce it as written. Arkansas Fuel Oil Corporation, supra, 141 So.2d at 520. See also Palmisano v. Mascaro, 611 So.2d 632 (La.App. 4th Cir.1992), and cases cited therein.
On the subject of the interpretation of contracts, we reproduce the principles set forth in the recent case of Spohrer v. Spohrer, 610 So.2d 849 (La.App. 1st Cir. 1992), at pages 851-853:

*1264 Legal agreements have the effect of law upon the parties, and, as they bind themselves, they shall be held to a full performance of the obligations flowing therefrom. Kean v. Lemaire, 451 So.2d 151, 153-54 (La.App. 1st Cir.1984). Courts are bound to give legal effect to all contracts, according to the true intent of the parties, and the intent is to be determined by the words in the contract when they are clear and explicit and lead to no absurd consequences. LSA-C.C. arts. 2045 and 2046; Massachusetts Mutual Life Insurance Company v. Nails, 549 So.2d 826, 832 (La.1989); Foret v. Louisiana Farm Bureau Casualty Insurance Company, 582 So.2d 989, 991 (La.App. 1st Cir.1991); Ransom v. Camcraft, Inc., 580 So.2d 1073, 1077 (La.App. 4th Cir.1991); Borden, Inc. v. Gulf States Utilities Company, 543 So.2d 924, 927 (La.App. 1st Cir.), writ denied, 545 So.2d 1041 (La.1989); Schroeter v. Holden, 499 So.2d 309, 311 (La.App. 1st Cir.1986). See also Kean v. Lemaire, 451 So.2d at 154. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. Borden, Inc. v. Gulf States Utilities Company, 543 So.2d at 927. The rules of interpretation establish that when a clause in a contract is clear and unambiguous, the letter of the clause should not be disregarded under the pretext of pursuing its spirit. Cashio v. Shoriak, 481 So.2d 1013, 1015 (La.1986); Borden, Inc. v. Gulf States Utilities Company, 543 So.2d at 927.
As a general rule, parol evidence is inadmissible to vary, modify, explain, or contradict a writing. Kean v. Lemaire, 451 So.2d at 154. In Investors Associates Ltd. v. B.F. Trappey's Sons, Inc., 500 So.2d 909, 912 (La.App. 3rd Cir.), writ denied, 502 So.2d 116 (La.1987), the court noted that:
[C]ontracts, subject to interpretation from the instrument's four corners without the necessity of extrinsic evidence, are to be interpreted as a matter of law. The use of extrinsic evidence is proper only where a contract is ambiguous after an examination of the four corners of the agreement.
However, as pointed out by the court in Investors Associates, Ltd., there are exceptions which permit reference to parol and other outside evidence. When the terms of a written contract are susceptible of more than one meaning, or there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed, or fraud is alleged, parol evidence is admissible to clarify the ambiguity, show the intention of the parties, or prove fraud. Borden, Inc. v. Gulf States Utilities Company, 543 So.2d at 927; Schroeter v. Holden, 499 So.2d at 311. Where the mutual intention of the parties has not been fairly explicit, the court may consider all pertinent facts and circumstances, including the party's own conclusions rather than adhere to a forced meaning of the terms used. Schroeter v. Holden, 499 So.2d at 311-12; Kean v. Lemaire, 451 So.2d at 154.
LSA-C.C. art. 2045 defines interpretation of a contract as "the determination of the common intent of the parties." Lindsey v. Poole, 579 So.2d 1145, 1147 (La.App. 2nd Cir.), writ denied, 588 So.2d 100 (La.1991). Such intent is to be determined in accordance with the plain, ordinary, and popular sense of the language used, and by construing the entirety of the document on a practical, reasonable, and fair basis. Lindsey v. Poole, 579 So.2d at 1147. Moreover, LSA-C.C. art. 2047 provides that "[t]he words of a contract must be given their generally prevailing meaning. Words of art and technical terms must be given their technical meaning when the contract involves a technical matter." The rule of strict construction does not authorize perversion of language or the creation of ambiguity where none exists and does not authorize courts to make a new contract where the language employed expresses the true intent of the parties. Ransom v. Camcraft, Inc., 580 So.2d at 1077. One of the best ways to determine what the parties intended in a contract is to examine the method in which the contract is *1265 performed, particularly if performance has been consistent for a period of many years. Gamble v. D.W. Jessen & Associates, 509 So.2d 1041, 1043 (La.App. 3rd Cir.), writ denied, 514 So.2d 454 (La. 1987). Intent is an issue of fact which is to be inferred from all of the surrounding circumstances. Borden, Inc. v. Gulf States Utilities Company, 543 So.2d at 927.
A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties. LSA-C.C. art. 2053. In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text and/or against the obligee and in favor of the obligor of a particular obligation. LSA-C.C. arts. 2056 and 2057.
In Borden, Inc. v. Gulf States Utilities Company, 543 So.2d at 928, this court set forth the appropriate standard of review as follows:
Whether a contract is ambiguous or not is a question of law. Where factual findings are pertinent to the interpretation of a contract, those factual findings are not to be disturbed unless manifest error is shown. However, when appellate review is not premised upon any factual findings made at the trial level, but is, instead, based upon an independent review and examination of the contract on its face, the manifest error rule does not apply. In such cases, appellate review of questions of law is simply whether the trial court was legally correct or legally incorrect. (citations omitted).
The threshold issue is whether the contract's terms are ambiguous or explicit. If the language of the contract provisions is determined to be explicit and unambiguous, no additional evidence can be considered. Frischhertz Electric Company, Inc. v. Housing Authority of New Orleans, 534 So.2d 1310, 1312 (La. App. 4th Cir.1988), writ denied, 536 So.2d 1236 (La.1989).
Suspensive condition is defined in LSA-C.C. art. 1767:
A conditional obligation is one dependent on an uncertain event.
If the obligation may not be enforced until the uncertain event occurs, the condition is suspensive.
If the obligation may be immediately enforced but will come to an end when the uncertain event occurs, the condition is resolutory.

DISCUSSION
Contrary to the Board's argument, this case does not fall squarely within the confines of Directional Adv. Serv., Div. of Ebsco Ind. v. Fairfield, 248 So.2d 388 (La. App. 4th Cir.1971). In that case, a contract between the plaintiff advertising agency and the defendant client provided that the plaintiff would provide the defendant with advertising services for an initial period of three (3) years. The contract also provided that a list of locations where the advertisements would be displayed would be furnished defendant. Plaintiff performed the services and was forced to file suit for specific performance when the defendant refused to perform his part of the obligation. The court determined that the "sine que non" of the alleged contract between the parties was the location of the ads; and the furnishing of the list was a suspensive condition. Therefore, according to the court, in the absence of such a list, there was no valid contract. However, in the case sub judice, regardless of whether or not ECS supplied an equipment list to the Board, the Board performed its obligation by submitting the utility invoices and paying the bills submitted by ECS which, in essence, the Board acquiesced to the fact that the equipment was installed and modifications made without prior approval. We have recognized and applied the rule that acceptance may be made in several different ways, and ordinarily need not be express or formal, but may be shown by words, conduct, or acquiescence indicating an assent. Woods v. Morgan City Lions Club, 588 So.2d 1196 (La.App. 1st Cir.1991). See also LSA-C.C. art. 1939. *1266 Furthermore, if the parties' intent was that the obligations incurred were conditioned on that provision, the Board had the power to cancel its performance. Instead, the Board proceeded with performance, over a period of twenty-eight (28) months. Therefore, the provision can only be interpreted as merely a requirement to insure that no improper material, equipment, or modification, would be used in the schools, not that the contract would not be perfected until the submission of the list. Therefore, the trial court erred, as a matter of law, in making the determination that the provision was a suspensive condition and ruling the contract invalid.
In an alternative ruling, the trial court found ECS breached its obligation under LSA-C.C. art. 1994 (see written reasons, infra):
An obligor is liable for the damages caused by his failure to perform a conventional obligation.
A failure to perform results from nonperformance, defective performance, or delay in performance.
We agree that ECS's actions constitute a defective performance and, as such, it is liable to the Board for damages caused by that defective performance. We find the Board entitled to judgment canceling the contract with ECS based upon ECS's conduct in the manner in which it determined energy savings.
Based on Provision X, infra, we find the terms are ambiguous and inexplicit. Specifically, the term "utilizing acceptable standards for energy use determination" creates ambiguity and does not provide a method for performance in that determination. Therefore, it was proper for the trial court to allow the introduction of parol evidence to clarify the ambiguity. Borden v. Gulf States Utilities Co., 543 So.2d 924, 927 (La.App. 1st Cir.), writ denied 545 So.2d 1041 (La.1989).
The trial court apparently relied on the Board's two experts, Jim Poche' and Judy Broussard, both of Poche' and Associates, an energy management consulting firm. Mr. Poche', a consultant mechanical engineer, reviewed a ten month period and based his testimony on the observations from that period. He examined all of the invoices submitted to ECS and the ECS invoices sent to the Board. He testified that ECS improperly "flipped-flopped" from one year to another in order to maximize the base year calculation. It was his opinion that this method is erroneous and ECS should have used one method on a continual basis through the entire contract. It was his opinion that ECS's method presented an incorrect representation of what the actual consumption was by using higher figures to show the highest possible base year.
Mr. Poche' also testified that it was his opinion that ECS calculated energy consumption on a meter by meter basis rather than on a campus by campus basis. It was his opinion that ECS should have used a campus by campus basis in order to get an adequate representation of energy consumption and savings. Additionally, from his review of the records, he discovered that ECS supplied information using gas meters that were disconnected to represent a decrease of usage. Furthermore, he noted several mathematical errors, either in the base year figure or in the units of measure.
Plaintiff's second expert, Ms. Judy Broussard, a certified energy manager, headed up the energy department for Poche' and Associates. She also studied the records for the same ten month period. Her testimony indicated that ECS was using an incorrect Cleco base rate for kilowatts, more than $1.45 per kilowatt hour over the true rate. She was unable to testify about those schools served by Slemco. She used ECS's invoices to determine the amount they were paid and the amount the Board paid for the utilities alone for the fiscal year 1985-86. For that year, the total paid in utilities amounted to $434,000.00. She then compared that figure to fiscal year 1986-87 and determined the total paid in utilities for that year was $502,000.00. It was Ms. Broussard's conclusion that the Board paid $68,000.00 more in the first year of the contract. She further calculated the effect of new air-conditioning *1267 units installed and attributed an increase of $10,000.00 to these units. For the fiscal year of 1986-87, according to Ms. Broussard, "... the bottom line is that in having ECS ... it cost $143,000.00 for that fiscal year." Her calculations were based merely on the physical dollars the school actually paid.
Contracts are to be performed and performance must conform to the agreement. Therefore, it is obvious from the record, specifically the expert testimony, that ECS did not conform to the "standards" and rendered defective services inconsistent with the agreement. Accordingly, ECS's obligations under Provision X were not fulfilled.

DAMAGES
Damages for obligor's failure to perform are measured by the loss sustained by the obligee and the profit of which he has been deprived. LSA-C.C. art. 1995.
It is plaintiff's burden to prove with legal certainty every item of the damages claimed. This burden must be borne by competent evidence showing the extent of the damage and plaintiff's own uncorroborated estimate of the value of the loss is insufficient. Smith v. White, 411 So.2d 731 (La.App. 3d Cir.), writ denied, 413 So.2d 508 (La.1982).
Damages recoverable in this instance are limited to any amounts overcharged because of the erroneous calculations. The Board is not entitled to a blanket recovery of all amounts paid to ECS as we cannot ascertain whether or not there had been a savings to the Board on energy consumption.
Neither expert gave a total figure on the amount overcharged for the period beginning April 1986 to August 1988, and we are unable to make such a determination from the record. Therefore, it is necessary for us to remand this case to the trial court for a determination of the amounts overcharged on a monthly, by campus, basis for the twenty-eight (28) month duration of the contract, using one method continuously throughout, consistent with the standards set by Mr. Poche' and Ms. Broussard. See Hagberg v. John Bailey Contractor, 435 So.2d 580 (La.App. 3d Cir.1983), writ denied, 444 So.2d 1245 (La.1984).

CONCLUSION
Accordingly, we affirm the trial court's judgment as to the cancellation of the contract. On the issue of damages, we reverse and remand for a determination of damages consistent with this opinion.
Costs of this appeal are to be paid by defendant-appellant, Energy Contracting Services, Inc.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.