|1DOUCET, Chief Judge.
This declaratory judgment action was filed by Braun Welding Supply, Inc. against Prax-air, Inc. and U.S. Airgas, Inc., assignees of Union Carbide Corporation, in connection with the interpretation of a “Right of First Refusal Agreement” Braun entered into with Union Carbide. Tri-Gas, the company seeking to purchase Braun’s assets, intervened. All parties filed motions for summary judgment. Judgment was entered in favor of Braun and Tri-Gas; defendants appeal. We reverse the judgment of the trial court. FACTS
Union Carbide, through its Linde Division, supplied Braun with industrial gases, gas cylinders and other related supplies. Apparently, Braun and Linde entered into an ^agreement whereby an audit was conducted every few years to account for Linde cylinders which had been lost or damaged. The audit covering the period September 30, 1982 through March 31, 1984, resulted in a claim by Linde against Braun for 1.2 million dollars. Apparently, Braun was unable to settle this debt, and negotiations were begun between the parties. Those negotiations resulted in a Letter Agreement dated April 18, 1986, whereby Braun was to pay Linde $450,-000.00 plus interest, from October 1, 1985. This indebtedness was evidenced by a note executed by Braun in favor of Linde. In addition, on the same date, as part of the Letter Agreement, Braun executed a “Right of First Refusal Agreement” in favor of Union Carbide, Linde’s parent company. The “Letter Agreement” and the “Right of First Refusal Agreement” form the heart of this controversy.
The Letter Agreement provides in part as follows:
3. The ... payments and options referred to above are made in compromise of the parties’ cylinder dispute and constitute a full and complete settlement of any and all of the respective claims of Braun and Linde as [of] ... close of business on March 31, 1984 [...]. [ ... ] This settlement is intended to be a full and complete and final settlement of all the Liabilities and shall not be subject to any claim of mistake of fact.
The pertinent sections of the “Right of First Refusal Agreement” state the following:
1. Right of First Refusal
(a) Right to Purchase. Except as provided in Company’s Articles of Incorporation or in Sections 1(b) and 1(c) below, until the later of the fifteenth anniversary of this Agreement or the date the Notes [ ...] have been paid in full, no Shareholder shall transfer to, nor shall Company issue to, any person party to this Agreement [ ...] any of the Shares unless the Shareholder(s) or Company, as the case may be [ ... ], has given Union Carbide prior written notice of such proposed transfer, which notice will: (A) set forth the price, and all the terms and conditions of such proposed transfer (including, if a Shareholder is the Seller, any [3covenants or agreements of the Seller or any associate of Seller not to compete with the business of Company); (B) contain an offer on behalf of the Seller to sell or issue to Union Carbide all of its Shares owned by such Shareholder upon the same terms and conditions as are offered to or by such person; and (C) contain a copy of the offer by such person, which offer must be bona fide and apply to all the Shares owned by such Shareholder. Union Carbide shall have the right to accept such offer [ ... ] by giving written notice thereof to the Seller at any time until ninety (90) days following the date Company completes the delivery of all the information required to be delivered to *390 Union Carbide pursuant to Section 2 hereof ...
3. Conduct of the Business of the Company
(a) Transfers of Assets, Mergers, etc. From the date hereof until the expiration of the rights afforded Union Carbide pursuant to Section 1 hereof, Company shall not sell, transfer or otherwise voluntarily convey all or substantially all of its assets or business nor shall merger [sic] or consolidate with any other corporation or entity (regardless of whether Company is the survivor of such merger or consolidation).
The “Right of First Refusal Agreement” further provided for its transfer or assignment by Union Carbide, its successors and assigns and that it would be governed by Louisiana law.
Sometime after these documents were con-fected, Braun decided it wished to sell out and began looking for a purchaser. Union Carbide/Linde became aware of this fact and communicated to Braun that although it was not in position to acquire the company itself, it would attempt to aid Braun in finding a purchaser.
The period between the beginning of February and the middle of May 1993 marks the most critical period in the case. On February 3, 1993, Tri-Gas sent to Braun a “Letter of Intent” whereby it proposed to buy Braun’s assets. Shortly thereafter, Braun notified Praxair, who had become the assign-ee of the “Right of First Refusal Agreement” (hereinafter, the ROFR Agreement), orally of Tri-Gas’ offer. When Tri-Gas’ written offer was not timely forwarded to Praxair, it wrote a letter dated March 8,141993, requesting same, as provided in the ROFR Agreement. That same day, Braun forwarded the proposed agreement to Praxair. Four days later, on March 12, 1993, Praxair informed Braun, by letter, that it considered the TriGas offer invalid and in contravention of the ROFR Agreement in as much as it was an offer to buy Braun’s assets and not Braun’s stock. However, in an attempt to move things along, Praxair enclosed a proposed amendment to the ROFR Agreement which would permit an asset sale with the written concurrence of Union Carbide (or its assign). This amendment to the ROFR agreement was never acted upon by Braun.
Thereafter, Braun continued to negotiate with Tri-Gas as if there was no impediment to an asset sale. Also, sometime after March 12,1993, the ROFR Agreement was assigned to U.S. Airgas, Inc. By a letter of intent telefaxed to Braun on May 3, 1993, and followed by written formal notice on May 7, 1993, Airgas attempted to accept the offer to buy Braun’s assets which was contained in Tri-Gas’ “Letter of Intent” dated February 3, 1993. Braun refused to honor this “offer” stating that it had negotiated a better deal with Tri-Gas which included indemnity for a possible asbestosis claim.
On May 10, 1993, Tri-Gas wrote to Braun urging that Braun proceed with the proposed sale to Tri-Gas, urged Braun to join in a declaratory judgment action against Praxair and Airgas, and containing a promise to indemnify Braun for “all costs, expenses (including your reasonable attorneys fees) and damages” in connection with said declaratory action or “any action which Praxair or Airgas attempts to assert against Braun arising from or growing out of such declaratory judgment suit or Braun’s sale or attempted sale of its assets to Tri-Gas.” Tri-Gas also wrote, on May 13, 1993, to Gordon Keen, Jr., Vice President of Airgas, a scathing condemnation of Airgas’ attempt to enforce the ROFR Agreement. Braun and Tri-Gas, and Braun and Airgas continued |5to negotiate at various times during the summer of 1993. Those negotiations revolved around Braun’s possible exposure in the asbestosis matter and to what extent Tri-Gas and/or Airgas was willing to accept Braun’s possible liability-
On July 28, 1993, Airgas submitted an offer to Braun’s attorney offering to indemnify Braun for the first $200,000.00 in “damages, claims, expenses, etc.” connected with the pending asbestosis litigation. The next correspondence between the principals, we find, is the August 19, 1993, letter from Braun’s counsel to Airgas’ attorney notifying Airgas that the offer is unacceptable and informing Airgas that this declaratory judgment action was to be filed that same day.
*391 LAW AND DISCUSSION
The record reveals the documents executed on April 18, 1986, settled a claim that Union Carbide had against Braun. The ROFR Agreement and Braun’s note for $450,000.00 were in exchange for Union Carbide foregoing its 1.2 million dollar claim against Braun for lost and damaged gas cylinders. The “Letter Agreement” and the ROFR Agreement of April 1986 form contracts between the parties. The general law of contract was recently reviewed by this court in Evangeline Parish School Bd. v. Energy Contracting Services, Inc., 617 So.2d 1259, 1263, 1264 (La.App. 3 Cir.), writ denied, 624 So.2d 1228 (La.1993), wherein the court stated:
The law of contracts in Louisiana is very specific: Agreements legally entered into have the effect of laws on those who have formed them. In following this language, we have declared that parties are free to make their own contracts, and however unusual, drastic, or unreasonable features may be therein, they should be enforced so long as they do not contravene good morals or public policy. See LSA-C.C. arts. 1759, 1983; Arkansas Fuel Oil Corporation v. Maggio, 141 So.2d 516 (La.App. 4th Cir.1962); Roser v. Webb, 542 So.2d 122 (La.App. 1st Cir.1989).
The policy of the law is that all men of lawful age and competent understanding shall have the utmost liberty of | ¡¡contracting and their contracts, when freely and voluntarily made, are not lightly to be interfered with by the courts. The court is not concerned with the wisdom or folly of the contract. The contract in this respect may be a hard one for the plaintiff, but it is one that the parties were competent to make and had the right to make. It is the law between the parties and the courts have no alternative except to enforce it as written. Arkansas Fuel Oil Corporation, supra, 141 So.2d at 520. See also Palmisano v. Mascaro, 611 So.2d 632 (La.App. 4th Cir.1992), and cases cited therein.
On the subject of the interpretation of contracts, we reproduce the principles set forth in the recent case of Spohrer v. Spohrer, 610 So.2d 849 (La.App. 1st Cir.1992), at pages 851-853:
Legal agreements have the effect of law upon the parties, and, as they bind themselves, they shall be held to a full performance of the obligations flowing therefrom. Kean v. Lemaire, 451 So.2d 151, 153-54 (La.App. 1st Cir.1984). Courts are bound to give legal effect to all contracts, according to the true intent of the parties, and the intent is to be determined by the words in the contract when they are clear and explicit and lead to no absurd consequences. LSA-C.C. arts. 2045 and 2046; Massachusetts Mutual Life Insurance Company v. Nails, 549 So.2d 826, 832 (La.1989); Foret v. Louisiana Farm Bureau Casualty Insurance Company, 582 So.2d 989, 991 (La.App. 1st Cir.1991); Ransom v. Camcraft, Inc., 580 So.2d 1073, 1077 (La.App. 4th Cir.1991); Borden, Inc. v. Gulf States Utilities Company, 543 So.2d 924, 927 (La.App. 1st Cir.), writ denied, 545 So.2d 1041 (La.1989); Schroeter v. Holden, 499 So.2d 309, 311 (La.App. 1st Cir.1986). See also Kean v. Lemaire, 451 So.2d at 154. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties’ intent. Borden, Inc. v. Gulf States Utilities Company, 543 So.2d at 927. The rules of interpretation establish that when a clause in a contract is clear and unambiguous, the letter of the clause should not be disregarded under the pretext of pursuing its spirit. Cashio v. Shoriak, 481 So.2d 1013, 1015 (La.1986); Borden, Inc. v. |7Gulf States Utilities Company, 543 So.2d at 927. As a general rule, parol evidence is inadmissible to vary, modify, explain, or contradict a writing. Kean v. Lemaire, 451 So.2d at 154. [ ... ]
And in Hornsby v. Ray, 327 So.2d 146, 150 (La.App. 3 Cir), writs refused, 330 So.2d 293 and 319 (La.1976), another panel of this court observed the following:
Nevertheless, our law recognizes that any contract may be later modified, abrogated or revoked by consent of the parties. Pri *392 sock v. Boyd, 199 So.2d 373 (La.App. 2d Cir.1967). And a written contract may be modified by oral agreement, provided the original contract was not required to be in writing. WWOM, Inc. v. Grapes, 181 So.2d 289 (La.App. 4th Cir.1965). [Emphasis ours].
Finally, we turn to a discussion by our supreme court in Felder v. Georgia Pacific Corp.[1], 405 So.2d 521 (La.1981) where at 523 and 524 the court explained as follows:
Civil Code article 3071, [ ... ], provides:
A transaction or compromise is an agreement between two or more persons, who, for preventing or putting an end to a lawsuit, adjust their differences by mutual consent, in the manner which they agree on, and which [gevery one of them prefers to the hope of gaining, balanced by the danger of losing.
This contract must be reduced into wilting.
While the statute itself does not provide for the consequences of failure to reduce a compromise agreement to writing, this Court has previously held that a compromise which is not reduced to writing is unenforceable. Bourgeois v. Franklin, 389 So.2d 358 (La.1980); Jasmin v. Gafney, Inc., 357 So.2d 539 (La.1978). Furthermore; we agree with plaintiff that the requirement that the agreement be reduced to writing necessarily implies that the agreement be evidenced by documentation signed by both parties. Singleton v. Bunge Corp., 364 So.2d 1321 (La.App. 4th Cir.1978).
As was stated in Bourgeois, supra, “La. C.C. art. 3071 is placed in the code to insure proper proof of extra-judicial agreements. Inasmuch as there is no judgment on the merits outlining the obligations each party has to the other when a case is settled by the parties, the law has seen fit to require the compromise agreement, which sets out those obligations, to be reduced to writing to serve as proof of the agreement and the acquiescence therein.” (Emphasis provided.) Obviously, to serve as written proof of the agreement and obligations of both parties, and their acquiescence therein, the written agreement must be signed by both parties, obligating both to do what they have agreed on. However, the requirement that the agreement be in writing and signed by both parties does not necessarily mean that the agreement must be contained in one document. [ ... ] In other words, where two instruments, when read together, outline the obligations each party has to the other and evidence each party’s acquiescence in the agreement, a written compromise agreement, as contemplated by La.C.C. art. 3071, has been perfected.
The record not only establishes that the documents executed by Braun and Union Carbide on April 18, 1986, are contracts, but that, taken together, they are a compromise and settlement of the 1.2 million dollar claim Union Carbide/Linde had against Braun. Accordingly, not only are they subject to the law governing contracts, but they are also subject to the specific requirements of the law governing compro-misesjgand settlements. While under general contract law oral modifications of written contracts are permitted, this is not the case where compromises and settlements are concerned. In the latter case any modifications must also be in writing. See Hornsby, supra. See also Christ v. Christ, 251 So.2d 197 (La.App. 3 Cir.1971); Huey Lumber & Millwork, Inc. v. Jackson, 212 So.2d 538 (La.App. 1 Cir.1968); and WWOM, Inc. v. Grapes, supra.
The ROFR Agreement prohibited Braun for selling “all or substantially all of its as *393 sets”. We find no written document in the record which modifies or abrogates this prohibition; rather all we find is an unacted upon offer to modify this term of the compromise.
Appellees argue that Airgas waived the prohibition on the sale of Braun’s assets by its negotiations with Braun. We do not find this to be the case. First, it is the sale of Braun’s assets which is prohibited by the ROFR Agreement, not the negotiations for such sale. At the time Airgas was negotiating with Braun, Braun had in its possession the proposed amendment to the ROFR Agreement which, if executed, would have permitted the sale. Airgas’ actions were in keeping with the ROFR Agreement and the proposed amendment. Braun chose not to accept either Airgas’ offer or the proposed amendment which would have allowed the sale of its assets. There was no mutual consent to either document; hence there was no sale to Airgas and no modification of the ROFR Agreement to allow the sale of Braun’s assets. See River Oaks, Inc. v. Blue Cross of Louisiana/Louisiana Health Service & Indemnity Co., 595 So.2d 785 (La.App. 5 Cir.), writ denied 598 So.2d 361 (La.1992).
Considering the record, and the law and jurisprudence set out above, we find the judgment of the trial court finding that portion of the Right of First Refusal Agreement which restricts and/or prohibits the sale of Braun’s assets unenforceable is clearly | ipwrong. Braun received good and valuable consideration (worth approximately one million dollars) for its execution of the ROFR Agreement and we find no written modification to the agreement which would allow Braun to sell all or essentially all of its assets. Therefore, the judgment in favor of Braun and Tri-Gas is also erroneous.
Accordingly, for the reasons stated, the judgment in favor of Braun Welding Supply, Inc. and Tri-Gas, Inc. is reversed and set aside. Further, It Is Ordered, Adjudged and Decreed that the motions for summary judgment filed by defendants, Praxair, Inc. and U.S. Airgas, Inc. are hereby granted and the prohibition on the sale of all or essentially all of Braun’s assets as set out in paragraph 3(a) of the Right of First Refusal Agreement is valid and enforceable. All costs of these proceedings at both the trial and appellate levels are assessed against Tri-Gas, Inc.
REVERSED AND RENDERED.

. La.C.C. art. 3071 has been amended to read as follows:
A transaction or compromise is an agreement between two or more persons, who, for preventing or putting an end to a lawsuit, adjust their differences by mutual consent, in the manner which they agree on, and which every one of them prefers to the hope of gaining, balanced by the danger of losing.
This contract must be either reduced into writing or recited in open court and capable of being transcribed from the record of the proceeding. The agreement recited in open court confers upon each of them the right of judicially enforcing its performance, although its substance may thereafter be written in a more convenient form.
This amendment did not change the law.