hPETERS, J.
This appeal arises from a judgment of the trial court terminating a contract between two corporations, Beno’s, Inc. and Professional Gaming Technology, Inc., and awarding Beno’s, Inc. additional relief under the contract. Professional Gaming Technology, Inc. has appealed, seeking reversal of the trial court’s judgment. *857 Beno’s, Inc. has answered the appeal, seeking additional damages and attorney fees. For the following reasons, we reverse the trial court’s judgment and render judgment in favor of Professional Gaming Technology, Inc., dismissing the demands of Beno’s, Inc.
DISCUSSION OF THE RECORD
In 1992, Beno’s, Inc. (Beno) operated a restaurant, lounge, and motel on Clover Hill Road in St. Martinville, Louisiana. On October 29, 1992, it entered into a written contract with Professional Gaming Technology, Inc. (PGT), a corporation in the business of placing and operating video poker devices in qualified commercial establishments, wherein it gave PGT the exclusive right to place and operate video poker devices in Beno’s “business premises” at 1178 Clover Hill Road in St. Martin-ville in exchange for one-half of the net proceeds produced by each device. The contract provided “for a term of three (3) years commencing on the date that [PGT] places [the] first video draw poker device in operation” on the premises. It further provided for year-to-year renewal rights at the end of the initial three-year term under the following conditions:
[T]his agreement shall be for the initial term heretofore stated in this agreement. Thereafter this agreement shall automatically be deemed renewed and extended for an additional period of one (1) year and thereafter for successive like periods unless either party hereto shall give written notice of intent to cancel this agreement to the other party by registered or certified mail ninety (90) days prior to the end of current term.
Reuben Talley executed the contract on behalf of Beno, and R.J. Romero executed | ait on behalf of PGT. The agreement contains no indication of either man’s capacity for representing their respective corporations. However, Talley is identified in testimony as Beno’s “owner” and Romero is identified as a “co-owner” of PGT.
Talley and Romero executed a second agreement on behalf of their respective corporations on August 17, 1993. This agreement also provided for a three-year primary term beginning with the placement of the first video poker device on the premises, contained the same agreement for the division of the net proceeds produced, and contained the same renewal language as described above.
Sometime after the 1992 and 1993 contracts were executed, Talley became dissatisfied with the percentage of profit Beno was receiving, and he and Romero negotiated a new agreement wherein Beno’s share was increased from fifty to fifty-five percent of the net proceeds. Sometime during the negotiation process, the parties executed a new agreement purporting to renew the “previous contract” for a period of five years from the date the new agreement was signed. This “RENEWAL AGREEMENT” also provided for a year-to-year automatic renewal using the exact language as appeared in the 1992 and 1993 contracts. It further provided that “[a]ll other terms are identical to the previous contract.” Determination of the effective date of this renewal agreement is necessary to dispose of the litigation now before us. The record actually contains four dated versions of the renewal agreement. The variations in each relate to percentage of net revenue to be paid to Beno and/or the execution date. Two of the four versions are dated October 29, 1999, and provide that “[PGT] agrees to pay [Beno] 50 (50%) percent of the net revenues generated by the operation of said video draw poker device(s).” Another version is dated, not October 29, 1999, but October 29, 1996. Additionally, the two *858 50’s in the |3original blank are struck through with a diagonal line and written underneath is “55% 45%.” The last version is dated October 29, 1999, and provides that “[PGT] agrees to pay [Beno] 55 (50%) percent of the net revenues generated by the operation of said video draw poker device(s).” Written below the underlined section is the notation “Change To 55%.” All four versions contain the signatures of Talley and Romero on behalf of their respective corporations, and the signature of Michael Anthony Castille, PGT’s general manager, as a witness.
The dispute now before us began when Beno attempted to cause PGT to remove its devices from Beno’s premises by the following correspondence signed by Talley on behalf of the corporation and sent to PGT on January 13,1999:
THIS LETTER IS TO GIVE YOU WRITTEN NOTICE OF INTENT TO CANCEL THE RENEWAL AGREEMENT BY REGISTERED OR CERTIFIED MAIL, NINETY (90) DAYS PRIOR TO THE END OF CURRENT TERM.
When PGT failed to remove its machines, Beno filed suit against PGT on December 20, 1999, requesting termination of “any agreement” between it and PGT, removal of PGT’s video poker devices from its premises, and damages for PGT’s refusal to timely remove the devices. However, in its petition, Beno did not assert any specific date that it considered the agreement terminated by its terms, apparently leaving that issue for the courts. Beno only asserted that, as of September 13, 1999, it had obtained authority to place video poker devices on the premises and operate them in its own name.
After trial, the trial court rendered judgment in favor of Beno and against PGT, terminating the contractual relationship between the two corporations effective October 28, 2000; awarding as damages to Beno all of the proceeds produced by PGT’s video poker devices that remained on Beno’s premises after October 28, 2000; |4and ordered PGT to remove its video poker devices from the premises “forthwith.” In its reasons for judgment, the trial court concluded that the renewal contract was signed in 1996 and was executed for the purpose of effecting the new agreement concerning the division of net proceeds between the corporations. The trial court further concluded that, by executing the renewal contract, the parties intended to extend the October 29, 1992 contract for a period of five years from October 28, 1995. Thus, Beno’s January 13,1999 notice, according to the trial court, was sufficient to terminate the contract effective October 28, 2000. PGT appealed this judgment, and Beno answered the appeal seeking additional relief.
OPINION
PGT asserts three assignments of error in its appeal. It first argues that the trial court erred in concluding that the renewal agreement terminated on October 29, 2000, and argues that this court should render judgment finding that it terminated in September of 2001. Next, PGT argues that the trial court erred in concluding that the intent of the parties in executing the 1996 renewal agreement was to renew the October 29, 1992 agreement for five years from October 29, 1995. Finally, PGT asserts that the trial court erred in not considering the August 17, 1993 contract and its application to the interpretation of the renewal agreement. Because the issues raised in the assignments overlap, we will consider all three together.
We first note that “[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in *859 search of the parties’ intent.” La.Civ. Code art. 2046. Additionally, while the question of whether a contract is ambiguous is a question of law, the trial court’s factual findings used in reaching its decision are to be reviewed under the manifest error rule. Borden, Inc. v. Gulf States Utils. Co., 543 So.2d 924 (La.App. 1 Cir.), writ denied, 545 So.2d 1041 (La.1989).
The renewal agreement at issue in this litigation clearly and explicitly provides for a five-year term “commencing on the date [the renewal agreement] is signed.” (Emphasis added). Unfortunately, after examining the renewal agreement, we are unable to ascertain the specific date on which it was signed. What we do know is that it was not signed on either October 29, 1996, or October 29, 1999. It could not have been signed by Romero in 1999 because he died in 1997. Additionally, it was signed before September 5, 1996, because, on that date, the Office of the Video Gaming Division of the Louisiana State Police (Gaming Division) in Baton Rouge, Louisiana, received one of the four versions introduced in evidence.
At trial, State Police Trooper Michael C. Baron produced an envelope from Beno’s Gaming Division file bearing Beno’s return address and reflecting a mailing date of September 4, 1996. According to Trooper Baron, the Gaming Division received this envelope on September 5, 1996. Included within the envelope was what appeared to be an original of the renewal agreement between Beño and PGT as well as fingerprint cards for Barbara Talley,[1] personal history questionnaires concerning Reuben Talley, Beno’s financial statements, and other completed forms required by the Gaming Division and signed by Reuben Talley. This particular version provided for a fifty percent payment of the net revenue to Beño, and was dated October 29, 1999. However, as Trooper Baron pointed out, the execution date had been obviously altered through the use of “white out.”
Trooper Baron produced a second version of the same agreement that he | ^retrieved from PGT’s Gaming Division file. While Trooper Baron could not be specific concerning when the Gaming Division received this version, he testified that it was sometime in 1997 or 1998. This version was dated October 29, 1999, and, instead of providing for an even division of the net revenues, the percentage blank on this copy had been altered to read “55 (50%),” with the written notation “Change to 55%” added below the altered percentage blank.
PGT neither admitted nor denied that it had provided the above version to the Gaming Division. Instead, Castille produced a third version from PGT’s files bearing an execution date of October 29, 1996. At trial, Castille testified that he witnessed Talley and Romero sign the document, and that, after Talley’s departure, he noticed that the copy of the executed renewal agreement left with PGT provided for an equal division of the net proceeds. Aware that the parties had negotiated a fifty-five/forty-five division, he called the error to the attention of Romero, who authorized him to correct the error. However, the corrected copy produced by Cas-tille does not match the copy found in PGT’s Gaming Division file. In this version, the numbers “50 (50%) ” had been stricken out with diagonal lines and underneath the percentage blank appeared the notation “55% 45%.” Additionally, Castille *860 testified emphatically that the renewal agreement was signed on October 26,1996.
At trial, Beno’s attorney produced yet a fourth version of the renewal agreement. This version matched in all respects the one received by the Gaming Division on September 5, 1996, but the record is silent concerning its origin.
In considering how to interpret an ambiguous term of a contract, the court in Spohrer v. Spohrer, 610 So.2d 849, 852 (La.App. 1 Cir.1992), stated:
When the terms of a written contract are susceptible of more than one meaning, or there is uncertainty or ambiguity as to its provisions, or the [7intent of the parties cannot be ascertained from the language employed, or fraud is alleged, parol evidence is admissible to clarify the ambiguity, show the intention of the parties, or prove fraud. Where the mutual intention of the parties has not been fairly explicit, the court may consider all pertinent facts and circumstances, including the party’s own conclusions rather then adhere to a forced meaning of the terms used.
(Citations omitted).
In the matter now before this court, Beno presented no substantive evidence establishing the specific date the renewal agreement was signed. In fact, initially Talley denied even signing the renewal contract, and testified that he did not even remember signing the 1992 and 1993 contracts. When confronted with the documents themselves, he acknowledged his signature, but still took the position that he had not signed the renewal agreement “with knowledge.”
Although Talley’s memory was clouded concerning the documents he might have signed, he was very clear in his testimony that around September or October 1996, he went to Romero’s office and negotiated the increase in net revenue payments. According to Talley, Beno’s percentage was increased immediately thereafter. Although asserting that the renewal agreement was signed on October 29, 1996, Cas-tille confirmed that the percentage of net revenue was increased immediately after the agreement was consummated. While the litigants agree that the net revenue payment records would establish the date of the new agreement, these records were not introduced in evidence.
Despite Talley’s assertion that he had no documentation concerning any of the agreements between Beño and PGT, the language of the January 13, 1999 termination letter appears to be taken almost verbatim from either one of the original agreements or the renewal agreement. Additionally, his assertion that he never forwarded any documents to the Gaming Division is not supported by the contents of Beno’s file |Rmaintained by that state agency.
The trial court recognized these inconsistencies in Talley’s testimony. In doing so, the trial court concluded that the corporations renegotiated the percentage division of the net revenues and the renewal agreement was the result of the negotiations. The trial court further concluded that the parties signed the renewal contract within the first four days of September 1996. We find no manifest error in these factual findings. However, we do find error in the trial court’s legal conclusion that the renewal contract’s five-year initial term began to run on October 29, 1995, and, therefore, expired on October 28, 2000.
The trial court reached this legal conclusion by ignoring the year-to-year automatic renewal provisions of the October 29, 1992 agreement. The agreement provided that the three-year primary term was to commence running “on the date [PGT] *861 places [the] first video poker device in operation” on the Clover Hill Road premises. Talley testified that, sometime between November 1992 and January 1993, PGT installed and began operating three video poker devices in the restaurant on the property, and that on October 25,1993, PGT installed and began operating three additional devices on the property. Considering the 1992 agreement alone, the three-year primary term of the contract expired, at the earliest, in November of 1995, and it automatically renewed through November of 1996. Therefore, standing alone, it had not terminated on October 25, 1995, as determined by the trial court.
However, one cannot consider the October 29, 1992 agreement without considering the August 17, 1993 agreement. Without further explanation, one can only assume that the 1993 agreement was executed to replace the 1992 agreement. Therefore, the parties had contracted for a three-year primary term ending August 16, |fl1996. Ignoring the renewal language of the 1993 agreement and applying the trial court’s rationale, the 1996 renewal agreement would have extended the original agreement from August 17, 1996, through August 16, 2001, and not October 28, 2000, as the trial court concluded.
However, we need not consider the relationship between the 1992 and 1993 agreements to determine the effective date of the renewal agreement because the agreement itself provides that the renewal period commenced to run on the day the renewal agreement was signed. The trial court concluded that the signing occurred sometime between September 1 and September 4, 1996, and we find no manifest error in that factual conclusion. Therefore, the renewal period began, at the very earliest, on September 1,1996, and extended through August 31, 2001.
While we need not reach a specific date the renewal agreement was signed to reverse the judgment in favor of Beno in this litigation, we note that the late August or early September 1996 signing probability is consistent with the other evidence presented. Both parties had every incentive to negotiate a renewal or extension given the impending termination of the initial term of the August 17, 1993 agreement. Otherwise, both would have faced an uncertain future on a year-to-year basis. PGT surrendered five percent of its profit in exchange for an extended term of operation, and Beno surrendered its right to explore other alternatives in exchange for the five percent increase.
Finding error in the trial court’s conclusion that the renewal agreement commenced October 25, 1995, we find merit in PGT’s assignments of error. Finding that the trial court’s judgment must be reversed, we need not consider Beno’s assignments of error in its answer to PGT’s appeal.
INDISPOSITION
For the foregoing reasons, we reverse the trial court’s judgment in favor of Beno’s, Inc., and render judgment in favor of Professional Gaming Technology, Inc., dismissing Beno’s, Inc.’s demands with prejudice. We tax all costs of these proceedings against Beno’s, Inc.
REVERSED AND RENDERED.

. This is the only reference to Barbara Talley in the record, and she is not otherwise identi-fled.