JjWOODARD, Judge.
This appeal arises out of a contract dispute. Beno’s appeals the trial court’s decision that PGT was entitled to 45% of revenues that PGT’s gaming devices, located on Beno’s premises, generated from August 31, 2001 through October 29, 2001. We affirm.
# ‡' # ‡
Professional Gaming Technology (PGT), an electronic video poker machine business, and Beno’s Inc. (Beno’s) initiated a business relationship with each other in 1992. Beno’s contracted with PGT for certain video poker gaming devices to be placed in its restaurants. The initial contract was for a three-year term with a subsequent self-executing option to renew the contract on an annual basis. It provided for each entity to receive 50 percent of the after-tax proceeds of the games. Af-terwards, the parties executed another agreement in which they altered their per *780 centages of revenue; namely, Beno’s received 55 percent of the proceeds and PGT received 45 percent of them. In 1999, Beno’s gave notice of its intent not to renew the contract. However, the parties disagreed concerning the execution date of their last contract, and, therefore, when the contract ended. The trial court found that the contract terminated on October 29, 2000 and awarded 100 percent of the proceeds gained after that date to Beno’s. This judgment also required PGT to remove its machines from Beno’s.
Both parties appealed that judgment. PGT suspensively appealed, which suspended, inter alia, the order for PGT to remove its machines. On March 28, 2001, while the appeal was pending, the parties entered into another contract — the “Escrow Agreement”- — -in order to secure the disputed funds until a final judgment was rendered. Specifically, it provided that 45 percent of the proceeds, generated from the machines after October 29, 2000, would be deposited into an escrow account until both parties authorized distribution or until a court order was rendered, directing the escrow agent regarding the manner in which to distribute them. Furthermore, this agreement provided that PGT would remove its machines from Beno’s premises no later than Oetobter 29, 2001, regardless of the status of the litigation. This date was exactly one year from when the trial court had found that the contract terminated. _J¿However, this court reversed the trial court’s decision, finding that the contract did not terminate until August 31, 2001, entitling PGT to 45 percent of the proceeds until then.[1] The current dispute is about the revenues that accrued in the two months between the termination of the contract on August 31, 2001 and October 29, 2001, the date on which PGT was required to, and did have, the machines removed under the Escrow Agreement.
PGT, Beno’s, and Iberia Bank, the designated Escrow Agent, filed a joint petition for concursus to have the money in the escrow account deposited into the registry of the court and relieve Iberia of its obligations, as well as to permit PGT to withdraw the portion that undisputably belonged to it. By the time of the fifing, forty-five percent of the after tax revenues, which the machines generated from October 29, 2000 through October 29, 2001, had been deposited into the escrow account. The total of these funds, plus interest, was $305,032.76. In their petition for concursus, the parties agreed that PGT was entitled to withdraw $260,997.94, the amount collected from October 29, 2000 until August 31, 2001, the date that the contract terminated according to this court. Therefore, the amount that remained in the escrow account, $44,034.82, represented 45 percent of the proceeds collected from August 31, 2001 through October 29, 2001, which, under the Escrow Agreement, was the final date for PGT to remove the machines from Beno’s. It is the disputed ownership of these funds that is before us on appeal.
At the hearing before the trial court, Mr. Donald Johnson testified for PGT; Mr. Reuben Talley testified for Beno’s, as they were the ones who signed the contracts on the entities’ behalf. The trial court ruled that the parties had agreed to continue the 55/45 percent split of the proceeds by executing the Escrow Agreement. Accordingly, it awarded PGT the entire amount remaining in the escrow account — 45 percent of the net revenues, plus interest that the machines generated *781 from August 31, 2001 through October 29, 2001.
We must decide whether the trial court erred in finding that the parties’ Escrow Agreement extended their original renewal contract.
* * * %
ESCROW Agreement
The trial court reasoned that:
Both, Mr. Donald Johnson, a principal with Professional Gaming Technology and Mr. Reuben Talley, a principal with Beno’s testified that the arrangement to allow the Professional Gaming Technology machines to remain operational in Beno’s place of business while the case was on appeal, was a mutual agreement for their mutual benefit in order to comply with state regulations for the operation of those machines and to insure that video gaming machines would remain on the premises at Beno’s through a coordinated move.
The court finds that while the basic contract between the parties terminated, as decided by the Third Circuit [sic] of Appeals, on August 31, 2001, the parties entered into an agreement for the Professional Gaming Technology machines to remain in Beno’s place of business and essentially agreed to a continuation of the contract for that period of time by executing the escrow agreement for their mutual benefit. The Court does not believe that Professional Gaming Technology would have agreed to accommodate Beno’s by keeping its machines in Beno’s place of business without an expectation of receiving some financial benefit from doing so. Likewise, the Court does not believe that Beno’s would expect a business person to donate the use of its equipment, free of charge for a two month period. Thus, the Court finds that the gross proceeds from the operation of the Professional Gaming Technology machines at Beno’s for the months of September and through October 29, 2001, have been thus far divided by the payment of applicable taxes to the State of Louisiana, with fifty-five (55 percent) percent of net proceeds being paid to Beno’s and finds that the remaining forty-five (45 percent) percent in escrow is the property of Professional Gaming Technology.
While we agree with the basic premise of the trial court’s analysis, we do not agree that the parties intended a tacit renewal of the previous contract by executing the Escrow Agreement. On the contrary, both were awaiting this court’s determination of when the previous contract terminated. The Escrow Agreement does not explicitly provide for the distribution of the revenues that are currently in dispute.
The Escrow Agreement states, in pertinent part:
Whereas PGT desires to appeal, as does Beno’s. The purpose of this agreement is to govern the conduct of the parties until such time as a final judgment is rendered in the aforementioned law suit .... if upon |4final judgment, PGT is required to remove its machines from Beno’s, PGT hereby agrees to conduct a coordinated move with Beno’s and the State Police, as to minimize machine downtime.
PGT hereby agrees to remove its machines in a coordinated move, so as to minimize downtime, no later than October 29, 2001, regardless of the status of the referenced litigation....
Agent shall hold the above described funds in escrow in a money market account until such time as Agent receives either:
*782 a) Written authorization to distribute said funds from both Beno’s and PGT .... or,
b) A final order of the 16th Judicial District Court, in and for the Parish of St. Martin, or the 3rd Circuit or the Supreme Court, State of Louisiana, specifically directing the Agent as to the manner in which the funds shall be distributed.
The purpose of the Escrow Agreement was to isolate and freeze the generated revenues during litigation. However, the Escrow Agreement does not contemplate the particular scenario that occurred. Namely, it does not provide for the fate of any revenues that might accrue after the date which our court deemed to be the expiration date but before October 29, 2001 — the date that the Escrow Agreement required PGT to remove the machines. The Escrow Agreement’s directive, that the funds be distributed according to our order, encompasses only the funds escrowed from October 29, 2000 to August 31, 2001, as those were the only funds affected by our court’s resolution of the previous dispute. Our decision that the contract terminated on August 31, 2001 has no effect on the funds escrowed from that date until the machines were removed at the end of October in 2001. And the Escrow Agreement makes no provision for the contingency that a new dispute would arise over the revenues that accrued while Beno’s retained the machines under the Escrow Agreement and permitted them to be used.
Nevertheless, PGT has asserted three distinct legal theories under which it urges its entitlement to the disputed 45 percent; namely, reconduction, unjust enrichment, and estoppel/detrimental reliance. After examining each of these under the light of the instant facts, we find none of these theories apply. Rather, we believe that this is, simply, a situation which the parties did not foresee and, therefore, did not provide for |Rin the Escrow Agreement. Ideally, the move could have been coordinated on or close to the termination date which this court decided, in which case no additional revenues would have accrued after the contract’s termination. However, while our court decided that the termination date was August 31, 2001, it did not render the decision until October of 2001, and revenues had already accrued after August. The parties did not account for this situation.
When the words of a contract do not address a specific situation, we must examine, not only, the words of the contract but, also, the surrounding circumstances to determine if the parties intended or would have included any implied incidental obligations in that situation.[2] “[I]t must be assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose.”[3] (Emphasis added.)
The circumstances of the instant case reveal several motivating factors for Beno’s to have entered into the Escrow Agreement and to consent to having PGT’s machines in use in its establishment until October 29, 2001. Since PGT filed a sus-pensive appeal which, in effect, suspended the court’s order for it to remove its machines, presumably, Beno’s could not simply bring in its own machines at that time but had to wait until PGT removed its *783 machines. Thus, it needed for PGT to keep the machines operational until PGT would agree to remove them as a coordinated move or this court made its decision, whichever came first, or it would have garnered no revenues at all. Compounding the situation for Beno’s was the Video Poker division of the Louisiana State Police, which strictly regulates the industry. The latter’s permission is required for all removals and installations of these machines, and the State Police must be present when new machines are installed, as Beno’s intended to do upon PGT’s removal of its machines. Obtaining approval, which first requires a written application, and arranging for the State’s Police’s presence take time. If PGT had simply removed its machines without a “coordinated move,” Beno’s would have had no operational machines and, therefore, no revenues until it could make the appropriate arrangements with the State Police. Thus, in order to replace PGT’s ^machines with its own without sacrificing any revenues, Beno’s wanted and agreed to a “coordinated move” and the outside date of October 29, 2001 for that endeavor.
On the other hand, PGT agreed to maintain and service the machines, as well as to arrange a “coordinated move” with Beno’s and the State Police, thus, ensuring there would be no “down time” for Beno’s, necessitating lost revenue, and with the hope that our court would rule in its favor, awarding it 45 percent of all accumulated revenues. Essentially, by leaving the machines in place and by agreeing to continue to its previous obligations to maintain and service the machines two or three times per week, PGT was taking a risk that it would incur these operational costs, as well as not receive any revenues for Beno’s use of its machines if our court affirmed the trial court’s decision that the contract ended on October 29, 2000 and Beno’s was to receive 100 percent of any revenues accrued after that date. While PGT tries to bolster its alleged entitlement to the disputed funds by arguing that it could have put its machines elsewhere and, impliedly, earned what it was earning in Beno’s, we must wonder why it refused to do so when it knew that Beno’s preference was for it to remove its machines so Beno’s could install its own. We must assume that PGT, too, thought it would financially benefit from having its machines in Beno’s.
Accordingly, regarding the parties’ implied obligations under the Escrow Agreement, we find that Beno’s impliedly obligated itself to give PGT 45 percent of the proceeds in exchange for maintaining and servicing the machines, as well as for PGT’s cooperation in arranging for a “coordinated move.” Thus, concerning the revenue for which these parties did not account, we find that their previous revenue-sharing agreement is the best evidence of equity and usage — -55 percent to Beno’s, 45 percent to PGT.
CONCLUSION
Beno’s appeals a judgment rendered against it, finding that 45 percent of the revenues, which the operation of PGT’s gaming machines generated for the two months after the parties’ contract terminated, still belonged to PGT based upon the parties’ execution of an Escrow Agreement. We affirm the trial court’s decision.
AFFIRMED.
PICKETT and EZELL, JJ., concur in the result.

. Beno’s, Inc. v. Prof'l Gaming Tech., 01-436 (La.App. 3 Cir. 10/3/01), 796 So.2d 856, writ denied, 01-2959 (La. 1/25/02), 807 So.2d 842.

. Hollenbach v. Holden, 98-970 (La.App. 3 Cir. 2/3/99), 728 So.2d 544.

. La.Civ.Code art.2054.