# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## CA 19-407


NOLTON DALCOURT

VERSUS

THOMAS MOYER, ET AL.


**********

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF ST. MARTIN, NO. 83622
HONORABLE GREGORY P. AUCOIN, DISTRICT JUDGE

**********

**BILLY HOWARD EZELL**
**JUDGE**

**********

Court composed of Billy Howard Ezell, D. Kent Savoie, and Van H. Kyzar, Judges.


**REVERSED AND RENDERED.**

**Mark Morovich Bonura**
**7733 Maple Street**
**New Orleans, LA 70118**
**(504) 532-3018**
**COUNSEL FOR DEFENDANTS/APPELLEES:**
> **Thomas Moyer**
> **Sherry Craig Moyer**

**John W. Tilly**
**Keaty & Tilly, LLC**
**2701 Johnston St, Ste 303**
**Lafayette, LA 70503**
**(337) 347-8995**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
> **Nolton Dalcourt**

**EZELL, Judge.**

Nolton Dalcourt appeals a trial court judgment finding he breached a purchase agreement to sell his house and holding he owed costs and attorney fees to the potential buyers. Mr. Dalcourt argues that it was the buyers who breached the agreement.

## FACTS

In 2014, Mr. Dalcourt decided to sell his house situated on 4.1 acres in St. Martinville, Louisiana. Sherry and Thomas Moyer contacted Dennis Jones, the agent who listed the house, about purchasing the house. Mr. Jones became a dual agent for both the buyers and the seller at the Moyers' request. On June 1, 2015, the parties agreed that the Moyers would purchase the property for $455,000.00. An addendum provided that Mr. Dalcourt would give the Moyers $35,000.00 as an allowance for repairs which would be withheld from the proceeds at closing. Mr. Dalcourt also agreed to leave the pool table upstairs, the workout equipment, and the theater room seating. The closing date was set for June 30, 2015. A due diligence period of fourteen days, commencing the first day after the agreement was accepted, was set for the Moyers to have an expert inspect the property and investigate other concerns that the buyers may have.

An inspection of the house was performed by an inspector on the last day of the due diligence period, June 15, 2015. Mr. Moyer expressed concerns after the inspection about a leaking air conditioner, clogged gutters, and wood damage. He did not express a concern that the shed could not be inspected. The parties came to an agreement, and an addendum to the purchase agreement was signed by both the Moyers and Mr. Dalcourt on June 16, 2015. The addendum provided a reduced purchase price of $416,000.00, with the seller paying $12,000.00 in closing costs,

and the repair allowance of $35,000.00 was voided from the contract. Evidence in the record indicates that the lender would not approve of withholding $35,000.00 from the proceeds at closing.

A couple of days following the inspection, Mr. Moyer used some software to lay out the property with measurements he had taken of the home and property with a tape measure. He concluded that the property line would split the driveway in half. He based his conclusion on representations from Mr. Jones as to the location of the boundary lines on the property. Mr. Jones told Mr. Moyer that the cut area around the property was the boundary. Mr. Moyer opined that the property was not as wide as suggested by Mr. Jones. Mr. Moyer then called Mr. Jones and requested a survey. He was told by Mr. Jones that Mr. Dalcourt had a survey. Mr. Dalcourt testified that he never had a survey and had no idea why Mr. Jones would tell Mr. Moyer that he did.

Approximately three days before the closing set for June 30, Mr. Dalcourt was notified that there was a question about encroachment issues and the boundaries of the property. Mr. Jones called Mr. Dalcourt and asked if Mr. Moyer could send someone out to perform a survey that day and locate the stakes. Mr. Dalcourt testified that no one was home that day but that any other day would be acceptable.

Mr. Moyer testified that he contacted a real estate attorney after he could not get a survey and was told that there was a twenty-foot servitude on the right side of the home, which coupled with the width of the home, would have the driveway encroaching on the neighboring property.

On June 27, 2015, the Moyers signed an addendum to the purchase agreement stating they wished to void the contract and seeking return of the

$4,000.00 deposit. Mr. Dalcourt attempted to salvage the sale and submitted another signed addendum on July 15, extending the closing date to on/or before August 15, to allow time to survey the property. This addendum listed the sales price at $416,000.00, with Mr. Dalcourt paying $12,000.00 in closing costs and prepaid items. The addendum also provided for additional conditions concerning the survey. If the survey showed no encroachment of the driveway onto the neighboring property, the Moyers would assume the cost of the survey and the $4,000.00 deposit would be awarded to Mr. Dalcourt if they did not purchase the property. If there was an encroachment that prevented the Moyers from purchasing the property, Mr. Dalcourt would be entitled to remedy the issue per the purchase agreement. If Mr. Dalcourt was unable to remedy the agreement, then the $4,000.00 deposit would go to the Moyers. The addendum further provided that the Moyers order an appraisal and title work within twenty-four hours of signing the addendum by all parties, and Mr. Dalcourt would order a survey within twenty-four hours of signing the addendum by all parties. The repair allowance of $35,000.00 would be voided from the contract. The pool table upstairs, the workout equipment, and theater room seating would remain with the property. Other than closing date, no other deadlines were extended. The Moyers never signed this addendum.

On July 19, 2015, Nancy Marcotte, broker of the Keller Williams company that listed the house, sent a letter to the Moyers explaining why she was giving the $4,000 deposit to Mr. Dalcourt. The house was later foreclosed on by Mr. Dalcourt's bank and sold.

On February 8, 2016, Mr. Dalcourt filed suit against the Moyers claiming that they were in default of the purchase agreement and seeking termination of the

agreement and stipulated damages of 10% of the sales price. He also sought attorney fees and costs. Additionally, Mr. Dalcourt sought compensation for the rent he paid to live in another residence when he had to lease other property in anticipation of the sale of the house.

The Moyers answered the suit and denied liability alleging that Mr. Dalcourt misrepresented the size of the property. They further allege that Mr. Dalcourt failed to allow them to inspect the property or to have it surveyed. The Moyers also claimed that there were encroachments that affected ingress and egress out of the property.

A trial of the matter was held on November 21, 2017. The trial court ruled in favor the Moyers ordering the return of the $4,000.00 deposit to the Moyers. The trial court also awarded attorney fees and costs to the Moyers. Mr. Dalcourt then appealed the judgment this court.

In *Dalcourt v. Moyer*, 18-412 (La.App. 3 Cir. 12/6/18), 260 So.3d 694, this court found that the trial court's judgment was not a final, appealable judgment because the judgment failed to specify an amount awarded in attorney fees and costs and only asked for an itemization of attorney fees and costs. The judgment further stated that if the parties could not agree as to the amount, the Moyers should file a rule to show cause for such a determination. This court dismissed the appeal and remanded the case for further proceedings because the judgment did not indicate the amount of recovery with certainty and precision.

On remand, a supplemental judgment was entered on February 1, 2019, with the trial court awarding attorney fees and costs in the amount of $13,981.96. Mr. Dalcourt then filed the present appeal. On appeal, Mr. Dalcourt asserts two assignments of error. He first claims the trial court erred in not applying the clear

4

and unambiguous language of the agreement when it found that the Moyers did not breach the contract by terminating the agreement after the deadline to do so had passed. In his second assignment of error, Mr. Dalcourt claims the trial court erred in finding him in default of the agreement when it found he had the obligations to disclose information and allow access to property when no such language in the contract obligated him to do so.

## PURCHASE AGREEMENT

Both of Mr. Dalcourt's assignments of error center around the language of the purchase agreement and the actions of parties pertaining to the agreement. In making its conclusion that Mr. Dalcourt breached the purchase agreement and the Moyers did not, the trial court ruled that:

> In conclusion, based upon the testimony and evidence, the Court finds that Mr. Dalcourt failed to comply with the terms and conditions of the contract by failing to provide immediate access to the property during inspection, failing to provide the appropriate water/sewerage inspection certificate, failing to resolve the boundary dispute, failing to notify of liens and servitudes on the property, and failing to provide merchantable title to the property.

The trial court further found that:

> Thomas Moyer and Sherry Craig Moyer are not in default of the contract's terms and conditions. The Moyers provided a deposit; provided appropriate funding information by submitting a loan application; performed an inspection and notified of discrepancies within the due diligence period; notified the agent that they wished to terminate the agreement with a return of deposit when Seller refused to make the requested repairs. However, the Seller refused to accept the buyer's decision and proposed that funds be withheld at closing for the repairs in the amount of $35,000.00, and then, when the lender would not accept those terms, the parties agreed to a reduction of the sales price. All of this negotiation took place after the inspection and due diligence time period without opposition by either party. Upon learning of the property boundary discrepancies, the Moyers notified the seller and requested the seller to supply a survey. When Nolton Dalcourt refused to supply a survey, the Moyers requested their own survey, they were again denied immediate access to the property. The

Moyers at that point informed the buyer, in writing, that they were terminating the contract and requested a return of their deposit.

A contract is to be interpreted according to the common intent of the parties. La.Civ.Code art. 2045. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La.Civ.Code art. 2046.

This court in *Clinkscales v. Columns Rehabilitation and Retirement Center,* 08-1312, p. 3 (La.App. 3 Cir. 4/1/09), 6 So.3d 1033, 1035-36 (alterations in original), explained the standard of review regarding the interpretation of a contracts as follows:

> Where factual findings are pertinent to the interpretation of a contract, those factual findings are not to be disturbed unless manifest error is shown. However, when appellate review is not premised upon any factual findings made at the trial level, but is, instead, based upon an independent review and examination of the contract on its face, the manifest error rule does not apply. In such cases, appellate review of questions of law is simply whether the trial court was legally correct or legally incorrect. (citations omitted).

*Evangeline Parish Sch. [Bd.] v. Energy Contr.*, 617 So.2d 1259, 1265 (La.App. 3 Cir.), *writ denied*, 624 So.2d 1228 (La.1993) (quoting *Borden, Inc. v. Gulf States Utilities Co.*, 543 So.2d 924, 928 (La.App. 1 Cir.), *writ denied*, 545 So.2d 1041 (La.1989)).

Failure to Provide Survey and Allow Inspection

The trial court found that Mr. Dalcourt did not allow access to a shed during the inspection period and Mr. Moyer was not provided immediate access to the property once he sought to determine if there were boundary issues after the due diligence period passed.

The purchase agreement provided for an inspection and due diligence period as follows:

6

<u>INSPECTION AND DUE DILIGENCE PERIOD:</u> The BUYER ACKNOWLEDGES THAT THE SALE PRICE OF THE PROPERTY WAS NEGOTIATED BASED UPON THE PROPERTY'S APPARENT CURRENT CONDITION; ACCORDINGLY, the SELLER IS NOT OBLIGATED TO MAKE REPAIRS TO THE PROPERTY, INCLUDING REPAIRS REQUIRED BY THE LENDER UNLESS OTHERWISE STATED HEREIN, THE SELLER IS RESPONSIBLE FOR MAINTAINING THE PROPERTY IN SUBSTANTIALLY THE SAME OR BETTER CONDITIONS AS IT WAS WHEN THE AGREEMENT WAS FULLY EXECUTED.

The BUYER shall have an inspection and due diligence period of (<u>14</u>) calendar days, commencing the first day after acceptance of this Agreement wherein, the BUYER may, at the BUYER'S expense, have any inspections made by experts or others of his choosing. Such physical inspections may include, but are not limited to, inspections for termites or other wood destroying insects, and/or damage from same, molds, and fungi hazards, and analysis of synthetic stucco, drywall, appliances, structures, foundations, roof heating, cooling, electrical, plumbing systems, utility and sewer availability and condition, out-buildings, and square footage. Other due diligence by the BUYER my include, but is not limited to investigation into the property's school district, insurability, flood zone classifications, current zoning and/or subdivision restrictive covenants and any items addressed in the SELLER'S Property Disclosure Document. All testing shall be nondestructive testing. The SELLER agrees to provide the utilities for inspections and immediate access. If the BUYER is not satisfied with the condition of the Property of the results of the BUYER'S due diligence inspection, the BUYER may choose one of the following options within the inspection and due diligence period:

Option 1: The BUYER may elect, in writing to terminate the Agreement and declare the Agreement null and void;
Or
Option 2: The BUYER may indicate in writing the deficiencies and desired remedies and the SELLER will within seventy-two (72) hours respond in writing as to the SELLER'S willingness to remedy those deficiencies ("SELLER'S Response").

Should the SELLER in the SELLER'S Response refuse to remedy any or all of the deficiencies listed by the BUYER, then the BUYER shall have seventy-two (72) hours from the date of the SELLER'S Response or seventy-two (72) hours from the date that the SELLER'S Response was due, whichever is earlier, to: (a) accept the SELLER'S Response to the BUYER'S written requests or (b) accept the Property in its current condition, or (c) to elect to terminate this Agreement. The BUYER'S response shall be in writing. Upon the BUYER'S

failure to respond to the SELLER'S Response by the time specified or the BUYER'S electing, in writing, to terminate this Agreement, the Agreement shall be automatically, with no further action required by either party, ipso facto null and void except for return of Deposit to the BUYER.

There is no doubt that the contract provided a fourteen-day due diligence period, commencing the day after the purchase agreement was signed. The Moyers were never denied access during this period, as Mr. Moyer agreed the property was inspected on the last day of the due-diligence period, June 15, 2015. Following this inspection, Mr. Moyer explained that the inspector discovered that the air conditioning unit was leaking, the gutters were clogged, and there was some wood deterioration, in addition to a few other minor issues. Mr. Moyer did tell Mr. Jones that the inspector did not have access to the back shed, which was locked. Although the Moyers' inspector could not access the shed on the property, they never complained nor sought access to the shed. Regardless, an addendum to the purchase agreement was signed by all parties on June 16, 2015, reducing the purchase price to $416,000.00 and removing the repair allowance of $35,000.00 from the contract. At this point, the sale continued to move forward. No other deficiencies were mentioned during the inspection period.

Reviewing the written reasons for judgment, it is obvious that the trial court's biggest concern was the refusal of Mr. Dalcourt to allow Mr. Moyer's surveyor access to the property to perform the survey on the same day as the request was made. This request was not made until well after the due diligence period passed and just three days before the closing. The trial court found that the lender halted the sale because it required the survey. However, the lender did not require the survey until it was notified by Mr. Moyer that there may be a boundary issue which was based on his personal observations after the due diligence period.

8

Mr. Moyer explained that he asked Mr. Jones if there was a survey. It was Mr. Jones who told Mr. Moyer that Mr. Dalcourt had a survey. Mr. Dalcourt testified that he never had a survey and never told Mr. Jones that he had survey. Nothing in the contract required Mr. Dalcourt to provide a survey. When Mr. Dalcourt built the house, he explained that he placed the house on the lot using points plotted by CPS Engineering. Mr. Dalcourt testified that there was never a boundary issue as long as he lived there.

Furthermore, there is no provision in the contract that required Mr. Dalcourt to allow access to the property after the due diligence period and before the closing date. Mr. Dalcourt did agree to allow access to the property to perform a survey at any other time, other than that day. He explained that no one was home the day of the initial request. Mr. Moyer is the party who did not take advantage of inspection until the last day of the due diligence period, which was clearly set forth in the purchase agreement signed by all the parties.

Even after Mr. Moyer sought to cancel the contract, Mr. Dalcourt tried to save the deal by offering an addendum that provided for a survey to be performed and how the sale would be handled, depending on the findings of the survey. As of trial, there was no evidence that there were boundary issues with property, other than Mr. Moyer's personal observations based on his measurements.

We find the trial court was clearly wrong in finding that Mr. Dalcourt failed to allow inspection of the property as required by the contract. Mr. Moyer was able to inspect the property during the due diligence period. Nothing in the contract provided for an inspection after this time period. All parties even signed a new addendum following the due diligence period with no concerns about boundaries or a request to survey the property. Regardless, Mr. Dalcourt did offer

to allow an inspection for a survey and extend the closing date. He did not violate the terms of the contract by refusing to allow someone at the house on the day requested after the due diligence period, when no one was home.

We do agree with the trial court that there appear to be some issues with Mr. Jones' handling of the situation as a dual agent. However, the failure to call Mr. Jones cannot be attributed solely to Mr. Dalcourt when the Moyers could have also called Mr. Jones to testify. *Shelvin v. Waste Mgt., Inc.*, 580 So.2d 1022 (La.App. 3 Cir. 1991); *Lawrence v. Gov't Employees Ins. Co.*, 13-1296 (La.App. 4 Cir. 10/15/14), 151 So.3d 917, *writ denied*, 14-2382 (La. 2/6/15), 158 So.3d 821.

Failure to Perform Septic/Treatment Inspection

The trial court also found that Mr. Dalcourt failed to obtain a water/sewerage inspection certificate and provide it to the Moyers as required by the contract. The purchase agreement provided that Mr. Dalcourt had to return the deposit to Mr. Moyer if he failed to "timely deliver . . . an approved sewerage and/or water inspection report as set forth" in the following addendum:

> This addendum is made a part of Louisiana Residential Agreement to Buy or Sell dated <u>06 01 2015</u>.
>
> 1. (x) SEPTIC/TREATMENT INSPECTION – The SELLER agrees to have <u>1</u> septic/treatment system(s) servicing only the primary residence inspected and approved by the appropriate governmental/governing authority. If the system(s) fail inspection, SELLER shall have the option to repair/replace the system(s) as long as the cost to repair/replace the system(s) does not exceed the sum of $<u>1,000.00</u>. If the cost to repair/replace the system(s) exceeds that amount and the SELLER chooses not to repair/replace the system(s), the BUYER shall have the option of accepting the Property with the private septic/treatment system(s) servicing only the primary residence in the current condition or terminate the Agreement in writing, which termination shall entitle the BUYER to a return of the BUYER'S deposit. Any repair/replacement of the system(s) must be permitted by the Louisiana Department of Health and Hospitals Office of Public Health, if applicable.

Mr. Dalcourt agreed that the sewer inspection was not performed. He testified that he never received notice that the Moyers wanted out of the purchase agreement because he failed to have the septic system inspected. Mr. Dalcourt agreed that he did not have the inspection performed because it is expensive, and he wanted to make sure the sale was going to be completed before he spent the money. In their answer, the Moyers did not complain that Mr. Dalcourt breached the purchase agreement for failure to conduct an inspection of the septic system.

> When a term for the performance of an obligation is either fixed, or is clearly determinable by the circumstances, the obligor is put in default by the mere arrival of that term. In other cases, the obligor must be put in default by the obligee, but not before performance is due.

La.Civ.Code art. 1990.

We first observe that there is no specific time listed that Mr. Dalcourt was required to inspect the septic system, other than to timely deliver the report. The Moyers gave notice that they wanted to terminate the contract on June 27, 2015, three days before closing. Mr. Moyer agreed that he never gave notice of an intention to cancel the sale due to lack of a septic system inspection. There is no evidence that Mr. Dalcourt refused to comply with his obligation to inspect the septic system prior to the completion of the sale or that he was put on notice that failure would render him in breach of the contract. The Moyers terminated the purchase agreement before Mr. Dalcourt could complete his obligations under the contract. We find the trial court clearly erred in finding Mr. Dalcourt breached the purchase agreement by failing to have the septic system inspected before Mr. Moyer sought cancellation of the purchase agreement.

11

Failure to Disclose Tax Lien

At trial, Mr. Dalcourt admitted that, in addition his home mortgage, there was a federal tax lien on the property and a judgment against him in favor of Louisiana ASH, the company that poured the driveway. He also explained that the bank halted foreclosure proceedings once he signed the purchase agreement with the Moyers.

We first observe that the Moyers never complained about the failure to disclose a tax lien against the property before they terminated the purchase agreement. Nothing in the purchase agreement required that Mr. Dalcourt disclose any liens or encumbrances. However, Mr. Dalcourt was required to deliver merchantable title.

"A merchantable title is one that 'can be readily sold or mortgaged in the ordinary course of business by reasonable person[s] familiar with the facts and questions involved.'" *Davis v. St. Romain*, 16-811, p. 8 (La.App. 3 Cir. 6/7/17), 222 So.3d 793, 799 (quoting *Vallery v. Belgard*, 379 So.2d 1201, 1204 (La.App. 3 Cir. 1980) (citing *Young v. Stevens*, 252 La. 69, 209 So.2d 25 (1967))). "Title does not become unmerchantable merely because litigation is possible, but only when the title is reasonably suggestive of future litigation." *Bart v. Wysocki*, 558 So.2d 1326, 1328-29 (La.App. 4 Cir. 1990). "Title is deemed unmerchantable only when there are outstanding rights in a third person of substantial nature against the property, subjecting the vendee to [serious] litigation." *Id*. at 1329. "[A] purchaser cannot refuse title because of encumbrances which can be satisfied from the purchase price." *Treadaway v. Williams*, 163 So.2d 911, 914 (La.App. 4 Cir. 1964).

There is no testimony or evidence in the record indicating that the lien or judgment could not be satisfied from the proceeds of the sale. Mr. Moyer testified that he applied for a loan at Central Federal Credit Union, but it fell through when he told the lender about his boundary concerns. This in turn halted the appraisal process. The sale did not fall through because there was a judgment against Mr. Dalcourt and a lien on the property.

We find the trial court manifestly erred in finding that Mr. Dalcourt breached the purchase agreement by failing to disclose a tax lien. There is no evidence that Mr. Dalcourt could not provide merchantable title to the property.

Failure to Disclose a Servitude

Finally, the trial court found Mr. Dalcourt in breach of the purchase agreement for failing to disclose a twenty-foot servitude affecting the use of the property. The issue of the servitude was raised by the Moyers after the due diligence period when they had questions about the boundary. Mr. Moyer contacted a real estate attorney when he had concerns about the boundaries of the property. The attorney notified him a couple of days later about the twenty-foot servitude on the property.

The purchase agreement provided that "[t]he property will be sold and purchased subject to title and zoning restrictions, servitudes of record, and law or ordinances affecting the Property." At trial, Mr. Dalcourt was cross-examined about a property disclosure form for residential real estate he signed on April 13, 2014. He agreed that he responded "no" to the question, "Are there any servitude, encroachments regarding the property other than typical customary utility servitudes that would affect the use of the property?"

13

The servitude at issue was granted by Mr. Dalcourt in favor of the Southwest Louisiana Electric Membership Corporation (SLEMCO) on September 28, 2009. The servitude provides SLEMCO the right to transmit electricity across the land and all other accessory rights necessary to transmit electricity. The servitude was recorded in the St. Martinville Parish Clerk of Court records on January 6, 2010.

In this modern age, most homes are supplied with electricity. We find that Mr. Dalcourt was not required to disclose the SLEMCO servitude, as it is a customary utility servitude for transmission of electricity to the home. The trial court was in legal error in finding that Mr. Dalcourt failed to disclose a servitude when the property disclosure form did not require him to disclose a customary utility servitude, such as an electrical servitude.

Once the addendum was signed on June 16, 2015, the contract was in place with both buyers and sellers agreeing to the terms. Mr. Moyer acknowledged that he and his wife sought cancellation of the purchase agreement solely due to their concerns about the boundaries and the electrical servitude on the property. The due diligence period had passed when the Moyers began to have concerns regarding the boundaries of the property. Mr. Dalcourt attempted to work with the Moyers, even though he was not required to do so under the purchase agreement, but to no avail. Furthermore, there is no evidence whatsoever that there is or was a boundary problem with the property. We find that the trial court was in error in finding that Mr. Dalcourt breached the purchase agreement. When the Moyers cancelled the purchase agreement alleging boundary issues and failure to disclose a servitude, Mr. Dalcourt was not in breach of the purchase agreement. Clearly, the Moyers breached the purchase agreement when they attempted to terminate the

14

contract after the due diligence period passed. The purchase agreement clearly provides that:

> FAILURE TO GIVE WRITTEN NOTICE OF EITHER TERMINATION OR DEFICIENCIES AND DESIRED REMEDIES TO THE SELLER (OR THE SELLER'S DESIGNATED AGENT) AS SET FORTH IN LINES 150 THROUGH 173 WITHIN THE INSPECTION AND DUE DILIGENCE PERIOD SHALL BE DEEMED AS ACCEPTANCE BY THE BUYER OF THE PROPERTY'S CURRENT CONDITION.

The Moyer's intention not to honor the purchase agreement "constituted an active breach of the purchase agreement." *Berenson v. McNeill*, 597 So.2d 94, 96 (La.App. 4 Cir.), *writ denied*, 600 So.2d 606 (La.1992). The purchase agreement only contemplated a return of the deposit if the "[a]greement is declared null and void by the BUYER during the inspection and due diligence period." The Moyers did not seek to terminate the agreement until after the due diligence period passed and shortly before closing.

For these reasons, we reverse the judgment of the trial court finding that Mr. Dalcourt breached the purchase agreement. We find that the Moyers breached the purchase agreement and therefore reverse the judgment of December 13, 2017, awarding them the return of the $4,000 deposit. We also reverse the supplemental judgment of February 1, 2019, awarding attorney fees and costs in the amount of $13,981.96. Mr. Dalcourt has only asked this court to reverse the judgment of the trial court finding him in default of the purchase agreement and failing to find that the Moyers breached the agreement. He has not requested any type of damages. Therefore, we make no award of any damages to Mr. Dalcourt. Costs of this appeal are assessed to Sherry and Thomas Moyer.

**REVERSED AND RENDERED.**